JUDGE KAPLAN

PREET BHARARA
United States Attorney for the
Southern District of New York
By: BRIAN M. FELDMAN
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Telephone No.  (212) 637-2777
Facsimile No.  (212) 637-2717
Brian.Feldman@usdoj.gov



11 CIV 2976

RECEIVED
MAY 03 2011
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    Plaintiff,

    -against-

DEUTSCHE BANK AG and MORTGAGEIT,
INC.,

    Defendants.

**COMPLAINT**

11 Civ. _____

ECF Case

**Jury Trial Demanded**

The United States of America (the "Government"), by its attorney, Preet Bharara, United

States Attorney for the Southern District of New York, brings this action against Deutsche Bank

AG ("Deutsche Bank") and MortgageIT, Inc. ("MortgageIT") (collectively "Defendants"),

alleging upon information and belief as follows:

## INTRODUCTION

1.    This is a civil mortgage fraud lawsuit brought by the United States against

Deutsche Bank and MortgageIT.  As set forth below, Deutsche Bank and MortgageIT repeatedly

lied to be included in a Government program to select mortgages for insurance by the

Government.  Once in that program, they recklessly selected mortgages that violated program

rules in blatant disregard of whether borrowers could make mortgage payments.  While Deutsche

Bank and MortgageIT profited from the resale of these Government-insured mortgages, thousands of American homeowners have faced default and eviction, and the Government has paid hundreds of millions of dollars in insurance claims, with hundreds of millions of dollars more expected to be paid in the future. The Government brings this action seeking damages and penalties for the past and future claims that violate the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and the common law.

2.     The Federal Housing Administration ("FHA") of the Department of Housing and Urban Development ("HUD") is the largest mortgage insurer in the world. FHA mortgage insurance makes home ownership possible for millions of American families by protecting lenders against defaults on mortgages, thereby encouraging lenders to make loans to borrowers who might not be able to meet conventional underwriting requirements. FHA accepts a fixed level of risk set by statute and HUD rules. FHA relies on this fixed level of risk to set appropriate mortgage insurance premiums to offset the costs of paying FHA insurance claims. By controlling risk and setting appropriate insurance premiums, FHA has been able to operate based solely on the income it generates from mortgage insurance premium proceeds. Since its inception in 1934, FHA has insured more than 34 million home mortgages. FHA currently insures approximately one third of all new residential mortgages in the United States.

3.     To assist as many qualified homeowners as possible, and to provide maximum economic opportunities to lenders interested in obtaining FHA insurance on mortgages, FHA operates a Direct Endorsement Lender program with lenders in the private sector. The Direct Endorsement Lender program grants participating lenders the authority to endorse mortgages that are qualified for FHA insurance. In reviewing mortgages for eligibility for FHA insurance,

2

Direct Endorsement Lenders are entrusted with safeguarding the public from taking on risks that exceed statutory and regulatory limits. Direct Endorsement Lenders act as fiduciaries of HUD in underwriting mortgages and endorsing them for FHA insurance.

4.      The integrity of the Direct Endorsement Lender program requires participating Direct Endorsement Lenders to carefully review mortgages to ensure compliance with HUD rules. HUD entrusts Direct Endorsement Lenders with great responsibility, and therefore places significant emphasis on the lenders' qualifications. To qualify as a Direct Endorsement Lender, a lender must implement a mandatory quality control plan. Quality control plans are necessary to ensure that Direct Endorsement Lenders follow all HUD rules, and to provide procedures for correcting problems in a lender's underwriting operations.

5.      An essential part of every quality control plan is the auditing of all early payment defaults, *i.e.*, those mortgages that default soon after closing. Early payment defaults may be signs of problems in the underwriting process. By reviewing early payment defaults, Direct Endorsement Lenders are able to monitor those problems, correct them, and report them to HUD. Every Direct Endorsement Lender must make an annual certification of compliance with the Direct Endorsement Lender program's qualification requirements, including the implementation of a mandatory quality control plan.

6.      On a mortgage-by-mortgage basis, HUD requires Direct Endorsement Lenders to conduct due diligence to ensure that each mortgage is eligible for FHA insurance as set forth in HUD rules. These rules exist to prevent HUD from insuring mortgages that exceed the risk levels set by statute and regulations. A Direct Endorsement Lender must assure HUD that every endorsed mortgage meets all HUD rules. HUD requires the Direct Endorsement Lender to

3

certify, for each mortgage the lender endorses, that the lender has conducted due diligence in accordance with all HUD rules. Absent a truthful mortgage eligibility certification, a Direct Endorsement Lender cannot endorse a mortgage for FHA insurance.

7.    Between 1999 and 2009, MortgageIT, Inc. was an approved Direct Endorsement Lender. During that time period, MortgageIT endorsed more than 39,000 mortgages for FHA insurance, totaling more than $5 billion in underlying principal obligations. These FHA-insured mortgages were highly marketable for resale to investors because they were insured by the full faith and credit of the United States. MortgageIT and Deutsche Bank, which acquired MortgageIT in 2007, made substantial profits through its resale of these endorsed FHA-insured mortgages.

8.    Deutsche Bank and MortgageIT had powerful financial incentives to invest resources into generating as many FHA-insured mortgages as quickly as possible for resale to investors. By contrast, Deutsche Bank and MortgageIT had few financial incentives to invest resources into ensuring the quality of its FHA-insured mortgages through the maintenance of the mandatory quality control program, or into ensuring that MortgageIT limited its endorsement of mortgages to those loans that were eligible for FHA insurance under HUD rules.

9.    Deutsche Bank and MortgageIT repeatedly lied to HUD to obtain and maintain MortgageIT's Direct Endorsement Lender status. Deutsche Bank and MortgageIT failed to implement the quality control procedures required by HUD, and their violations of HUD rules were egregious. For instance, Deutsche Bank and MortgageIT failed to audit MortgageIT's early payment defaults; Deutsche Bank and MortgageIT failed to dedicated sufficient staff to quality control; MortgageIT repeatedly failed to address dysfunctions in the quality control system,

4

which were reported to upper management; MortgageIT took the only staff member dedicated to auditing FHA-insured mortgages, and reassigned him to increase production instead; and when an outside auditor provided findings to MortgageIT revealing serious problems, those findings were literally stuffed in a closet and left unread and unopened.

10.    Despite Deutsche Bank's and MortgageIT's egregious violations of this basic eligibility requirement, every year for a decade Deutsche Bank or MortgageIT annually certified that MortgageIT complied with the eligibility criteria of the Direct Endorsement Lender Program. MortgageIT did so to maintain its Direct Endorsement Lender status in contravention of HUD rules.  Moreover, on various occasions when HUD discovered evidence that MortgageIT was violating the quality control requirement, MortgageIT deceived HUD by falsely promising HUD that it had corrected the failures.  Through these false annual certifications and deceptions, Deutsche Bank and MortgageIT obtained and maintained MortgageIT's Direct Endorsement Lender status without the required quality control program in place, thereby putting hundreds of millions of FHA dollars at risk.

11.    As a Direct Endorsement Lender, MortgageIT repeatedly lied to HUD to obtain approval of mortgages that MortgageIT underwriters wrongfully endorsed for FHA insurance. These mortgages were not eligible for FHA insurance under HUD rules.  Notwithstanding the mortgages' ineligibility, underwriters at MortgageIT endorsed the mortgages by falsely certifying that they had conducted the due diligence required by HUD rules when, in fact, they had not.  By endorsing ineligible mortgages and falsely certifying compliance with HUD rules, MortgageIT wrongfully obtained approval of these ineligible mortgages for FHA insurance.

5

12.    As of February 2011, HUD has paid more than $386 million in FHA insurance claims and related costs arising out of Defendants' approval of mortgages for FHA insurance. Many of these losses were caused by the false statements Defendants made to HUD to obtain FHA insurance on thousands of individual loans.  The Government expects HUD will be required to pay hundreds of millions of dollars in additional FHA insurance claims as additional mortgages underwritten by MortgageIT default in the months and years ahead.

13.    In this suit, the United States seeks treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and compensatory and punitive damages under the common law theories of breach of fiduciary duty, gross negligence, negligence, and indemnification, for the insurance claims already paid by HUD for mortgages wrongfully endorsed by MortgageIT.  In addition, the United States seeks compensatory and punitive damages under the common law theories of breach of fiduciary duty, gross negligence, negligence, and indemnification, for the insurance claims that HUD expects to pay in the future for mortgages wrongfully endorsed by MortgageIT.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction pursuant to 31 U.S.C. § 3730(a), 28 U.S.C. §§ 1331 and 1345, and the Court's general equitable jurisdiction.

15.    Venue is appropriate in this judicial district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)(1) and (c) because Deutsche Bank and MortgageIT transact significant business within this district and therefore are subject to personal jurisdiction in this judicial district.

**PARTIES**

16.     Plaintiff is the United States of America.

17.     Defendant Deutsche Bank is a German business corporation with an office in Manhattan. Deutsche Bank acquired the business of Defendant MortgageIT, Inc. on or about January 3, 2007. Since Deutsche Bank acquired MortgageIT, Deutsche Bank has operated the business of MortgageIT as part of its residential mortgage business based in Manhattan. As a result of that acquisition, the former Chairman and Chief Executive Officer of MortgageIT, Doug Naidus, became a Managing Director and the Head of Mortgage Origination within Deutsche Bank's Residential Mortgage Backed Securities group. After the acquisition, Deutsche Bank managed the quality control functions of MortgageIT's Direct Endorsement Lender business, and was responsible for the submission of MortgageIT's Direct Endorsement Lender annual certifications to HUD. After the acquisition, Deutsche Bank assumed ultimate responsibility for MortgageIT's actions as a Direct Endorsement Lender, and is liable for those actions under the False Claims Act and the common law. Deutsche Bank has assumed the liabilities of MortgageIT.

18.     Defendant MortgageIT is a New York business corporation with its principal place of business in Manhattan. Between 1999 and 2009, MortgageIT was a Direct Endorsement Lender. During that time period, MortgageIT employed more than 2,000 people, had branches throughout the country, and was licensed to originate residential mortgages in all 50 states. MortgageIT has been a wholly owned subsidiary of Deutsche Bank since on or about January 3, 2007.

## FACTS

I.    **BACKGROUND**

   A.    **The FHA Direct Endorsement Program**

   19.    FHA is the largest insurer of residential mortgages in the world.  Pursuant to the

National Housing Act of 1934, FHA offers various mortgage insurance programs.  Through these

programs, FHA insures approved lenders against losses on mortgage loans.  FHA mortgage

insurance may be granted on mortgages used to purchase homes, improve homes, or to refinance

existing mortgages.  FHA's single family mortgage insurance programs cover owner-occupied

principal residences.

   20.    FHA mortgage insurance programs help low-income and moderate-income

families become homeowners by lowering some of the costs of their mortgage loans.  FHA

mortgage insurance encourages lenders to make loans to otherwise creditworthy borrowers and

projects that might not be able to meet conventional underwriting requirements by protecting the

lenders against defaults on mortgages.

   21.    To qualify for FHA mortgage insurance, a mortgage must meet all of the

applicable HUD requirements.  Those requirements relate to, among other things, the adequacy

of the borrower's income to meet the mortgage payments and other obligations, the borrower's

creditworthiness, and the appropriateness of the valuation of the property subject to the

mortgage.

   22.    HUD operates the Direct Endorsement Program as part of the FHA-insured

mortgage program.  Under the Direct Endorsement process, HUD does not itself conduct a

detailed review of applications for mortgage insurance before an FHA-insured mortgage closes.

Rather, approved lenders, called Direct Endorsement Lenders, must determine whether the proposed mortgage is eligible for FHA insurance under the applicable program regulations. A Direct Endorsement Lender underwrites and closes mortgages without prior HUD review or approval. Direct Endorsement Lenders submit documentation regarding underwritten loans after the mortgage has closed, and certifies that the endorsed mortgage complies with HUD rules.

23.     The Direct Endorsement Program works as follows:  The Direct Endorsement Lender originates a proposed loan, or in some instances, acts as a sponsoring lender by underwriting and funding proposed mortgages originated by other FHA lenders known as loan correspondents.  In either case, the Direct Endorsement Lender ultimately reviews the proposed mortgage.  The borrower, along with the Direct Endorsement Lender's representative, completes the loan application.  A loan officer collects all supporting documentation from the borrower and submits the application and documentation to the Direct Endorsement Lender.  The Direct Endorsement Lender obtains an appraisal.  A professional underwriter employed by the Direct Endorsement Lender performs a mortgage credit analysis to determine the borrower's ability and willingness to repay the mortgage debt in accordance with HUD rules.  The Direct Endorsement Lender's underwriter makes the underwriting decision as to whether the mortgage may be approved for FHA insurance or not, according to HUD rules.  If the underwriter has decided that the mortgage may be approved for FHA insurance in accordance with HUD rules, the Direct Endorsement Lender closes the loan with the borrower.  Thereafter, the Direct Endorsement Lender certifies that the mortgage qualifies for FHA insurance.  FHA endorses the loan on the basis of the Direct Endorsement Lender's certification and provides the Direct Endorsement Lender with a mortgage insurance certificate.

24.     The Direct Endorsement Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage.  FHA endorses mortgages in reliance upon the Direct Endorsement Lender's certifications that the mortgages may be approved for FHA insurance.  Direct Endorsement Lenders obligate HUD without independent HUD review.

25.     In the event that a borrower defaults on an FHA-insured mortgage, the holder of the mortgage is able to submit a claim to HUD for the costs associated with the defaulted mortgage.

26.     In the mortgage industry, the imprimatur of FHA mortgage insurance makes covered mortgages highly marketable for resale to investors both because such mortgages are expected to have met all HUD requirements and because they are insured by the full faith and credit of the United States.

**B.      Direct Endorsement Lenders And Underwriters**

27.     A mortgage lender must apply to FHA's Office of Lender Activities and Program Compliance to become a Direct Endorsement Lender.

28.     To qualify for FHA approval as a Direct Endorsement Lender, a lender must have a qualified underwriter on staff.  The underwriter's responsibilities are critical elements of the Direct Endorsement Program, and a Direct Endorsement Lender must certify that its underwriters meet FHA qualifications.

29.     An underwriter must be a full time employee of the mortgage lender and must either be a corporate officer with signatory authority or otherwise be authorized to bind the mortgage lender in matters involving origination of mortgage loans.  An underwriter must also

10

be a reliable and responsible professional who is skilled in mortgage evaluation and able to demonstrate knowledge and experience regarding principles of mortgage underwriting.

30.     An underwriter must "evaluate [each] mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.5(d). In addition, the underwriter must "have [each] property appraised in accordance with [the] standards and requirements" prescribed by HUD. 24 C.F.R. § 203.5(e).

### C.   Quality Control Prerequisites For Direct Endorsement Lenders

31.     To qualify for FHA approval as a Direct Endorsement Lender, a lender must implement a quality control plan that ensures its underwriters' compliance with HUD rules.

32.     The development and implementation of a quality control plan is a basic eligibility requirement for Direct Endorsement Lenders. HUD has determined that the Direct Endorsement Lender program can be offered only if participating lenders have acceptable quality control plans. Accordingly, as a precondition to Direct Endorsement Lender approval, HUD will require each lender to have an acceptable quality control plan to manage, conduct, and review the underwriting of mortgages that are submitted for direct endorsement.

33.     A Direct Endorsement Lender must have a fully functioning quality control program form the date of its initial FHA approval until final surrender or termination of its approval. Thus, a Direct Endorsement Lender must implement and continuously have in place a quality control plan as a condition of receiving and maintaining FHA approval.

11

34.     The purposes of quality control plans include ensuring that the procedures and personnel used by Direct Endorsement Lenders when underwriting mortgages meet all HUD requirements, and providing procedures for correcting problems once a Direct Endorsement Lender becomes aware of their existence.

35.     A mandatory HUD requirement for the implementation of Direct Endorsement Lender quality control plans is the review of all early payment defaults.  Early payment defaults are mortgages that go into default (*i.e.*, are more than 60 days past due) within the first six payments of the mortgage.

36.     Early payment defaults are markers of mortgage fraud.  Early payments defaults reveal that the borrower – whom the Direct Endorsement Lender had certified as having met all criteria for creditworthiness, and could thus be expected to make payments for the life of the mortgage – could not, in fact, make even the first six payments of the mortgage.

37.     A Direct Endorsement Underwriter must review each early payment default for compliance with HUD underwriting requirements.  A Direct Endorsement Lender that lacks a quality control program that provides for such review is in violation of HUD's quality control requirements.

**D.**     **Direct Endorsement Lenders' Duties**

    **1.**     **Due Diligence As Required By Regulation**

38.     HUD relies on Direct Endorsement Lenders to conduct due diligence on Direct Endorsement loans.  The purposes of due diligence include (1) determining a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties, *see* 24 C.F.R. § 203.5(d), and (2) examining a property offered as security for the

loan to determine if it provides sufficient collateral, *see* 24 C.F.R. § 203.5(e)(3).  Due diligence

thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay,

cash to close, and collateral.  In all cases, a Direct Endorsement Lender owes HUD the duty, as

prescribed by federal regulation, to "exercise the same level of care which it would exercise in

obtaining and verifying information for a loan in which the mortgagee would be entirely

dependent on the property as security to protect its investment."  24 C.F.R. § 203.5(c).

     39.     HUD has set specific rules for due diligence predicated on sound underwriting

principles.  In particular, HUD requires Direct Endorsement Lenders to be familiar with, and to

comply with, governing HUD Handbooks and Mortgagee Letters, which provide detailed

processing instructions to Direct Endorsement Lenders.  These materials specify the minimum

due diligence with which Direct Endorsement Lenders must comply.

     40.     With respect to ensuring that borrowers have sufficient credit, a Direct

Endorsement Lender must comply with governing HUD Handbooks, such as HUD 4155.1,

*Mortgage Credit Analysis for Mortgage Insurance on One-to-Four-Family Properties*, to

evaluate a borrower's credit.  The rules set forth in HUD 4155.1 exist to ensure that a Direct

Endorsement Lender sufficiently evaluates whether a borrower has the ability and willingness to

repay the mortgage debt.  HUD has informed Direct Endorsement Lenders that past credit

performance serves as an essential guide in determining a borrower's attitude toward credit

obligations and in predicting a borrower's future actions.

     41.     To properly evaluate a borrower's credit history, a Direct Endorsement Lender

must, at a minimum, obtain and review credit histories; analyze debt obligations; reject

documentation transmitted by unknown or interested parties; inspect documents for proof of

authenticity; obtain adequate explanations for collections, judgments, recent debts and recent credit inquiries; establish income stability and make income projections; obtain explanations for any gaps in employment; document any gift funds; calculate debt and income ratios and compare those ratios to the fixed ratios set by HUD rules; and consider and document any compensating factors permitting deviations from those fixed ratios.

42.     With respect to appraising the mortgaged property (*i.e.*, collateral for the loan), a Direct Endorsement Lender must ensure that an appraisal and its related documentation satisfy the requirements in governing HUD Handbooks, such as HUD 4150.2, *Valuation Analysis for Home Mortgage Insurance*. The rules set forth in HUD 4150.2 exist to ensure that a Direct Endorsement Lender obtains an accurate appraisal that properly determines the value of the property for HUD's mortgage insurance purposes.

### 2.     Due Diligence As Required By Common Law

43.     Direct Endorsement Lenders owe HUD a common law duty of due diligence.

44.     The exercise of due diligence is an affirmative duty of Direct Endorsement Lenders. This duty obligates Direct Endorsement Lenders to comply with HUD rules, accepted practices of prudent lending institutions, and all procedures that a prudent lender would use if it looked solely to the property as security to protects its interests. The duty further obligates the Direct Endorsement Lender to use due care in providing information and advice to FHA.

45.     Indeed, "[t]he entire scheme of FHA mortgage guaranties presupposes an honest mortgagee performing the initial credit investigation with due diligence and making the initial judgment to lend in good faith after due consideration of the facts found." *United States v. Bernstein*, 533 F.2d 775, 797 (2d Cir. 1976).

46.     HUD has apprised Direct Endorsement Lenders of this common law duty since it first created the Direct Endorsement Lender program. *See* 48 Fed. Reg. 11928, 11932 (Mar. 22, 1983) ("The duty of due diligence owed the Department by approved mortgagees is based not only on these regulatory requirements, but also on civil case law."); *id.* ("HUD considers the exercise of due diligence an affirmative duty on the part of mortgagees participating in the program.").

### 3.     The Fiduciary Duty Of Utmost Good Faith

47.     A fiduciary relationship exists between Direct Endorsement Lenders and HUD.

48.     HUD relies on the expertise and knowledge of Direct Endorsement Lenders in providing FHA insurance. HUD places confidence in their decisions. The confidence that HUD reposes in Direct Endorsement Lenders invests those lenders with an advantage in the Direct Endorsement Lenders' relationship with HUD.

49.     Direct Endorsement Lenders are under a duty to act for HUD, and give advice to HUD, for HUD's benefit, as to whether mortgages should be insured by FHA under the Direct Endorsement Lender program.

50.     As a result of the fiduciary relationship between Direct Endorsement Lenders and HUD, Direct Endorsement Lenders have a duty to HUD of *uberrmiae fidea*, or, the obligation to act with the utmost good faith, candor, honesty, integrity, fairness, undivided loyalty, and fidelity in dealings with HUD.

51.     The duty of *uberrmiae fidea* also requires Direct Endorsement Lenders to refrain from taking advantage of HUD by the slightest misrepresentation, to make full and fair

disclosures to HUD of all material facts, and to take on the affirmative duty of employing reasonable care to avoid misleading HUD in all circumstances.

52.     The duty of *uberrmiae fidea* further requires Direct Endorsement Lenders to exercise sound judgment, prudence, and due diligence on behalf of HUD in endorsing mortgages for FHA insurance.

### E.     Direct Endorsement Lender Certifications

#### 1.     Annual Certifications

53.     To obtain and maintain Direct Endorsement Lender status, a Direct Endorsement Lender must submit an annual certification to HUD.

54.     The Direct Endorsement Lender must make the following annual certification, in sum and substance:

> I know or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

55.     The annual certification requires compliance with the basic eligibility requirements for Direct Endorsement Lenders, which includes compliance with HUD rules concerning lender's quality control.

#### 2.     Loan Application Certifications

56.     A Direct Endorsement Lender must submit a certification to FHA for each loan for which it seeks FHA insurance.

16

57.     A Direct Endorsement Lender may use an FHA-approved automated underwriting system to review loan applications. The automated underwriting system processes information entered by the Direct Endorsement Lender and rates loans as either an "accept"/"approve" or a "refer"/"caution."

58.     In cases where a Direct Endorsement Lender uses an FHA-approved automated underwriting system, and the system rates a loan as an "accept" or "approve," the Direct Endorsement Lender must make the following certification, in sum and substance:

> This mortgage was rated as an "accept" or "approve" by a FHA-approved automated underwriting system. As such, the undersigned representative of the mortgagee certifies to the integrity of the data supplied by the lender used to determine the quality of the loan, that Direct Endorsement Underwriter reviewed the appraisal (if applicable) and further certifies that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program. I hereby make all certifications required by this mortgage as set forth in HUD Handbook 4000.4.

59.     In cases where a Direct Endorsement Lender uses an FHA-approved automated underwriting system, and the system rates a loan as "refer" or "caution," or in cases where a Direct Endorsement Lender does not use an FHA-approved automated underwriting system, the underwriter must make the following certification, in sum and substance:

> This mortgage was rated as a "refer" or "caution" by a FHA-approved automated underwriting system, and/or was manually underwritten by a Direct Endorsement underwriter. As such, the undersigned Direct Endorsement Underwriter certifies that I have personally reviewed the appraisal report (if applicable), credit application, and all associated documents and have used due diligence in underwriting this mortgage. I find that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program and I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4.

60.     The certifications in HUD Handbook 4000.4, incorporated by reference in the certifications above, include the certification that the mortgage complies with HUD underwriting requirements contained in all outstanding HUD Handbooks and Mortgagee Letters.

61.     Absent a truthful mortgage eligibility certification, a Direct Endorsement Lender cannot endorse a mortgage for FHA insurance.

## II.   MORTGAGEIT'S DIRECT ENDORSEMENT LENDER ACTIVITIES

62.     MortgageIT became an FHA-approved mortgage company and Direct Endorsement Lender on October 28, 1999.

63.     MortgageIT maintained its status as an FHA-approved mortgage company and Direct Endorsement Lender through October 16, 2009.

64.     MortgageIT, and Deutsche Bank after January 2007, filed with HUD annual certifications of MortgageIT's purported compliance with the Direct Endorsement Lender program's qualification requirements, including the implementation of a mandatory quality control plan.

65.     As a Direct Endorsement Lender, MortgageIT approved more than 39,000 mortgages for FHA insurance, totaling more than $5 billion in underlying principal obligations. For each mortgage, MortgageIT certified that it complied with all HUD rules.

66.     As of February 2011, of the more than 39,000 mortgages for FHA endorsed by MortgageIT, more than 12,500 of those mortgages (*i.e.*, approximately a third) defaulted. Of those, more than more than 3,100 defaulted within six months, more than 4,500 defaulted within a year, and more than 6,900 defaulted within two years of closing.

67.    As of February 2011, HUD has paid more than $386 million in FHA insurance claims and related costs arising out of more than 3,100 mortgages.  Of these, HUD has paid more than $97 million in FHA claims and related costs arising out of more than 600 mortgages that defaulted within six months, more than $160 million in FHA claims and related costs arising out of more than 1,100 mortgages that defaulted within a year, and more than $258 million in FHA claims and related costs arising out of more than 2,000 mortgages that defaulted within two years.

68.    As of February 2011, more than 7,500 additional mortgages, totaling more than $888 million in calculated unpaid principal balances, have defaulted, without any claims yet having been paid by HUD.  Of these, there are more than $260 million of calculated unpaid principal balances for more than 1,700 mortgages defaulted within six months, there are more than $348 million of calculated unpaid principal balances for more than 2,300 mortgages defaulted within a year, and there are more than $493 million of calculated unpaid principal balances for more than 3,400 mortgages defaulted within two years.

## III.    DEUTSCHE BANK AND MORTGAGEIT LIED TO MAINTAIN MORTGAGEIT'S DIRECT ENDORSEMENT LENDER STATUS

69.    Deutsche Bank and MortgageIT failed to comply with HUD rules and regulations regarding required quality control procedures, even though those procedures were mandatory for MortgageIT's maintenance of its Direct Endorsement Lender status.  Instead, Deutsche Bank and MortgageIT maintained MortgageIT's Direct Endorsement Lender status by making false representations to HUD about MortgageIT's purported compliance with HUD rules and

regulations regarding quality control. In reality, MortgageIT's quality control procedures egregiously violated HUD rules and regulations.

**A.      Deutsche Bank And MortgageIT Certified And Represented To HUD That MortgageIT Would Comply With HUD's Mandatory Quality Control Requirements**

**1.      Deutsche Bank and MortgageIT Annually Certified Compliance With Quality Control Requirements**

70.      Between 1999 and 2009, MortgageIT and, after January 2007, Deutsche Bank, filed annual certifications with HUD to obtain and maintain MortgageIT's Direct Endorsement Lender status. In those annual certifications, Deutsche Bank and MortgageIT certified MortgageIT's compliance with all HUD rules and regulations necessary for maintenance of its Direct Endorsement Lender status.

71.      Between 1999 and 2006, MortgageIT filed the annual certifications with HUD. For instance, on February 1, 2005, Gary Bierfriend, the President of MortgageIT, signed an annual certification stating "I know or am in the position to know, whether the operations of this mortgagee conforms to all HUD regulations and guidelines. I certify that to the best of my knowledge, the mortgagee conforms to all HUD regulations necessary to maintain its HUD/FHA approval." MortgageIT officers filed similar certifications each year between 1999 and 2006.

72.      Between 2007 and 2009, Deutsche Bank filed the annual certifications with HUD. For instance, on February 6, 2009, Joseph Swartz, a Deutsche Bank Director, signed an annual certification stating "I know, or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks and policies. I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval." Deutsche Bank officers filed similar

certifications each year after 2007, until MortgageIT ceased its operations as a Direct Endorsement Lender in 2009.

73.    A regulation necessary to maintain HUD approval for Direct Endorsement Lender status is the HUD regulation mandating continuous implementation of a quality control plan conforming to HUD rules, including the rule requiring review of all early payment defaults.

### 2.    MortgageIT Made Additional Representations To HUD That It Would Comply With Quality Control Requirements

74.    In addition to the annual certifications, MortgageIT made additional representations to HUD that MortgageIT would comply with quality control requirements, including, in particular, the review of all early payment defaults.

75.    For example, a HUD audit conducted during the week of September 13, 2003, by the HUD Quality Assurance Division, Philadelphia Homeownership Center, revealed that MortgageIT had "not maintained a Quality Control Plan, (QC) plan in accordance with HUD/FHA requirements," and that, among other failures, MortgageIT had failed to "ensure that loans that go into default within the first 6 months are reviewed." The 2003 audit required MortgageIT to provide a statement of corrective action to prevent a recurrence of the violation.

76.    MortgageIT responded to the 2003 audit by informing HUD that it had altered its quality control procedures to follow HUD rules, including by ensuring the review of all early payment defaults. That representation was false.

77.    As another example, a HUD audit conducted during the week of September 20, 2004, by the HUD Quality Assurance Division, Philadelphia Homeownership Center, again revealed that MortgageIT had failed, among other things, to ensure "that loans which go into

default within the first six months are reviewed." The 2004 audit required MortgageIT to

provide a statement of corrective action to prevent a recurrence of the violation.

78.     In response to the 2004 audit, MortgageIT promised HUD that it would review all

early payment defaults. In particular, by letter dated June 24, 2005, the Director of Government

Lending at MortgageIT acknowledged that MortgageIT's failure to review all early payment

defaults was "unacceptable," and that "mortgagees must review all loans going into default

within the first six payments." The Direct of Government Lending at MortgageIT further

represented that MortgageIT "understands HUD's directive" to review all early payment defaults,

and that MortgageIT would "comply with this request." That representation was false.

79.     Later, in February 2006, the HUD Quality Assurance Division, Philadelphia

Homeownership Center, discovered, through communications with MortgageIT, that MortgageIT

was not reviewing early payment defaults. HUD officials scolded personnel at MortgageIT for

their failure to review all early payment defaults.

80.     In response, the Director of Government Lending at MortgageIT represented to

HUD that MortgageIT would review all early payment defaults. That representation was false.

### B.     Contrary to Deutsche Bank And MortgageIT's Representations To HUD, They Egregiously Violated HUD's Quality Control Rules

81.     Contrary to the representations made by Deutsche Bank and MortgageIT,

Deutsche Bank and MortgageIT failed to implement a quality control plan complying with HUD

rules. Rather, as explained further below, Deutsche Bank and MortgageIT continually failed to

implement basic quality control principles.

82.     Deutsche Bank's and MortgageIT's quality control violations were egregious.

83.     These egregious quality control violations were being committed simultaneously with Deutsche Bank's and MortgageIT's false representations and certifications to HUD that MortgageIT would comply with HUD quality control requirements.

### 1.     Deutsche Bank and MortgageIT Failed To Review All Early Payment Defaults

84.     The HUD rules require Direct Endorsement Lenders to review all early payment defaults as a mandatory part of quality control.

85.     Contrary to the repeated representations and certifications made by Deutsche Bank and MortgageIT, MortgageIT failed to review all early payment defaults as mandated by HUD rules.

86.     Deutsche Bank and MortgageIT personnel failed to review all early payment defaults.  In fact, despite repeated representations to HUD that MortgageIT would conduct early payment default reviews as part of MortgageIT's quality control, MortgageIT quality control personnel did now know how to identify early payment defaults until February 2006.  After MortgageIT quality control personnel learned how to identify early payment defaults, MortgageIT nevertheless failed to review all early payment defaults.

87.     In addition, outside vendors failed to review all early payment defaults for MortgageIT.  Although, in certain years, MortgageIT contracted with outside vendors to conduct audits of certain MortgageIT loans, the outside vendors were unable to review all early payment defaults because MortgageIT failed to identify early payment defaults to the vendors.

### 2.     Deutsche Bank And MortgageIT Ignored Quality Control

88.     In addition to failing to review early payment defaults as required by HUD rules, Deutsche Bank and MortgageIT also failed to implement the minimal quality control processes they purportedly had in place.

### a.     MortgageIT Stuffed Its Vendors' Quality Control Audits in a Closet, Unread and Unopened

89.     Until late 2005, MortgageIT had no personnel to conduct the required quality control reviews for closed FHA-insured loans.

90.     In or about 2004, MortgageIT contracted with an outside vendor, Tena Companies, Inc. ("Tena"), to conduct quality control reviews of closed FHA-insured loans.

91.     As noted above, those reviews did not include early payment defaults because MortgageIT failed to identify early payment defaults to Tena.

92.     Throughout 2004, Tena prepared findings letters detailing underwriting violations it found in FHA-insured mortgages underwritten by MortgageIT.

93.     The findings letters included the identification of serious underwriting violations. Among the serious underwriting violations identified in the Tena findings were violations by a MortgageIT underwriter in the MortgageIT Chicago branch.  The underwriting violations involved mortgages in the Michigan market, including properties in and around Dearborn, Michigan, and certain repeat brokers in that market.

94.     No one at MortgageIT read any of the Tena findings letters as they arrived in 2004.

95.     Instead, MortgageIT employees stuffed the letters, unopened and unread, in a closet in MortgageIT's Manhattan headquarters.

96.     The letters remained unopened until December 2004 or January 2005.

97.     In December 2004, MortgageIT hired its first quality control manager. The quality control manager asked to see the Tena findings, but was not provided with any findings. After searching throughout the office, the head of the credit department at MortgageIT showed the quality control manager to a closet. The quality control manager opened the closet and found a series of envelopes, unopened and still sealed, in the closet.

98.     The envelopes were disorganized. They contained the unread Tena findings.

99.     The quality control manager opened the Tena findings, for the first time, in December 2004 or January 2005. The quality control manager quickly identified serious underwriting violations, which had remained unread over the course of the preceding year.

100.    MortgageIT's failure to read the audit reports from its outside vendor prevented MortgageIT from taking appropriate actions to address patterns of ongoing underwriting violations.

### b.     MortgageIT Upper Management Failed to Fix a Dysfunctional Quality Control System

101.    When MortgageIT hired a quality control manager for the first time in December 2004, the quality control manager attempted to implement a quality control system at MortgageIT. The system quickly proved dysfunctional.

102.    The quality control system was supposed to work as follows: The quality control manager would identify closed mortgages for review by an outside vendor. The outside vendor would perform a preliminary review and send the findings to the MortgageIT quality control manager. To evaluate the findings, the MortgageIT quality control manager would send them to the branches that had underwritten the mortgages at issue. The branches would respond to the

findings, so that the MortgageIT quality control manager could assess problems with the quality of MortgageIT's underwriting. The MortgageIT quality control manager would write up her assessment in a quarterly report to upper management.

103.   The system described above never worked.

104.   In particular, the branches never provided responses to the preliminary quality control findings of the outside vendor. The quality control system therefore broke down halfway.

105.   As a result, the MortgageIT quality control manager was not able to generate an assessment of quality issues to present to management in a quarterly report.

106.   The MortgageIT quality control manager complained to upper management at MortgageIT that the quality control system was broken. The MortgageIT quality control manager asked for assistance in addressing the problems with the quality control system.

107.   MortgageIT, however, failed to make any changes in response to the complaints and requests of the quality control manager.

       **c.**    **Deutsche Bank and MortgageIT Failed to Provide Guidance to MortgageIT Quality Control Personnel**

108.   Deutsche Bank and MortgageIT failed to provide guidance, including the required quality control plan, to its personnel conducting quality control.

109.   For instance, between the first quarter of 2006 and the close of MortgageIT's Direct Endorsement Lender business in 2009, MortgageIT's quality control was conducted by a Government Loan Auditor. During that period, the Government Loan Auditor was the only employee at Deutsche Bank and MortgageIT tasked with reviewing closed FHA-insured mortgage files.

110.    Deutsche Bank and MortgageIT never provided the Government Loan Auditor with a copy of MortgageIT's required quality control plan.

111.    Deutsche Bank and MortgageIT never explained the contents of the required quality control plan to the Government Loan Auditor.

112.    Deutsche Bank and MortgageIT never provided the Government Loan Auditor with any guidance concerning his review of closed FHA-insured mortgage files.  Among other things, Deutsche Bank and MortgageIT never provided the Government Loan Auditor with criteria as to which mortgage files to review, or how many mortgage files to review.

113.    Instead, the Government Loan Auditor was wholly without guidance as to any quality control plan at MortgageIT.

### 3.    Deutsche Bank and MortgageIT Chronically Understaffed Quality Control

114.    Deutsche Bank and MortgageIT failed to adequately staff the quality control reviews of closed FHA-insured mortgages.

115.    When MortgageIT interviewed its first quality control manager in December 2004, MortgageIT informed the manager that she would have a full staff to conduct quality control reviews.

116.    In order to review all early payment defaults as required by HUD rules, Deutsche Bank and MortgageIT would have needed to employ a staff of at least six to eight employees.

117.    Deutsche Bank and MortgageIT never provided the quality control manager at MortgageIT with a full staff.

118.    In fact, Deutsche Bank and MortgageIT never employed more than one person to conduct quality control reviews of closed FHA-insured mortgages.

27

119.    Between 2006 and 2009, the sole employee at Deutsche Bank or MortgageIT conducting quality control reviews of closed FHA-insured mortgages was the Government Loan Auditor.  His review of closed FHA-insured mortgages continually declined during that period, however, because, to increase sales, Deutsche Bank and MortgageIT shifted his work from quality control reviews of closed mortgage (*i.e.*, quality control audits) to assistance with production.  Accordingly, by the end of 2007, the Government Loan Auditor was no longer spending any time conducting quality control reviews of closed mortgage files.

120.    By the end of 2007, not a single person at Deutsche Bank or MortgageIT was conducting quality control reviews of closed FHA-insured mortgages, as required by HUD rules.

### C.    The Absence Of The Required Quality Control Systems Led To Patterns Of Underwriting Violations And Mortgage Fraud

121.    Deutsche Bank's and MortgageIT's failure to implement the required quality control systems rendered them unable to prevent patterns of mortgage underwriting violations and mortgage fraud.

122.    One illustration of this failure is the pattern of underwriting violations in Michigan, which MortgageIT could have and should have stopped with proper quality control systems and responses.  In this example, as in other cases, the absence of the required quality control systems led MortgageIT to miss multiple opportunities to detect serious underwriting violations and mortgage fraud.  Moreover, here, as elsewhere, MortgageIT failed to comply with its basic quality control obligations, including its obligation to address serious quality problems when they arise, and to report suspected mortgage fraud to HUD.  Instead, MortgageIT – including upper management at MortgageIT – knowingly, wantonly, and recklessly permitted

egregious underwriting violations to continue unabated.  These failures caused the Government millions of dollars in losses.

123.    As noted, MortgageIT lacked a system for reviewing early payment defaults. Such a system would have identified a pattern of early payment defaults in Michigan involving a common underwriter and common brokers.  If MortgageIT had conducted the required early payment default reviews, it would have recognized these problems by 2004, terminated the underwriter and MortgageIT's relationship with the brokers, and reported the problems to HUD, pursuant to HUD rules.  MortgageIT failed to do so.  As a result, the underwriter continued her pattern of serious underwriting violations, and the brokers continued their pattern of submitting ineligible and/or fraudulent mortgages.

124.    Throughout 2004, the Tena findings described above identified underwriting violations by a MortgageIT underwriter who engaged in a pattern of serious underwriting violations with common brokers.  If MortgageIT had read, in a timely manner, the findings provided to it by Tena, it would have recognized these problems by mid-2004, terminated the underwriter and MortgageIT's relationship with the brokers, and reported the problems to HUD, pursuant to HUD rules.  MortgageIT failed to do so.  As a result, the underwriter continued her pattern of serious underwriting violations, and the brokers continued their pattern of submitting ineligible and/or fraudulent mortgages.

125.    In early 2005, MortgageIT's quality control manager read the Tena findings for the first time, and identified the MortgageIT underwriter engaging in the pattern of serious underwriting violations with common brokers.  The quality control manager informed upper management within MortgageIT, including the president of the company, about these serious

29

problems. In mid-2005, the quality control manager asked the president and other upper management at MortgageIT to take action. The president of MortgageIT failed to do so. As a result, the underwriter continued her pattern of serious underwriting violations, and the brokers continued their pattern of submitting ineligible and/or fraudulent mortgages.

126.   In September 2005, a MortgageIT employee employed outside of the quality control group identified the same pattern of underwriting violations described above. She likewise informed upper management of the problem. MortgageIT, however, once again failed to take action against the underwriter. As a result, the underwriter continued her pattern of serious underwriting violations, and some of the brokers continued their pattern of submitting ineligible and/or fraudulent mortgages.

127.   In February 2006, HUD discovered the pattern of underwriting violations described above and discussed the pattern with MortgageIT. MortgageIT failed to take effective action for months. As a result, the underwriter continued her pattern of serious underwriting violations until May 2006, and some of the brokers likewise continued their pattern of submitting ineligible and/or fraudulent mortgages until then.

128.   If MortgageIT had the required quality control procedures in place, it would have recognized the patterns described above by at least sometime in mid-2004 and addressed them. Doing so in this instance would have prevented approximately one hundred mortgages from being endorsed for FHA insurance, which subsequently defaulted, and which have accounted for millions of dollars in claims.

129.    This is just one illustration of how Deutsche Bank and MortgageIT's failure to implement the required quality control systems rendered them unable and unwilling to prevent patterns of mortgage underwriting violations and/or mortgage fraud.

> **D.     HUD Has Paid Hundreds Of Millions Of Dollars In Insurance Claims Thus Far Based On Mortgages Endorsed By MortgageIT**

130.    The false certifications and representations by Deutsche Bank and MortgageIT regarding purported compliance with HUD quality control requirements permitted MortgageIT to endorse more than 39,000 mortgages for FHA insurance.

131.    As of February 2011, HUD has paid more than $386 million in FHA insurance claims and related costs arising out of MortgageIT's approval of mortgages for FHA insurance.

132.    HUD expects to pay at least hundreds of millions of dollars in additional FHA insurance claims as additional mortgages underwritten by MortgageIT default in the months and years ahead.

## IV.    MORTGAGEIT ABUSED ITS DIRECT ENDORSEMENT LENDER STATUS TO ENDORSE THOUSANDS OF MORTGAGES INELIGIBLE FOR FHA INSURANCE

133.    MortgageIT abused the Direct Endorsement Lender status that it maintained through the lies of Deutsche Bank and MortgageIT.  In particular, as a Direct Endorsement Lender, MortgageIT regularly violated HUD rules, prudent underwriting practices, and MortgageIT's duties to HUD, by failing to conduct due diligence on mortgages that it reviewed and approved for FHA insurance.  Despite its repeated violations of HUD rules, MortgageIT falsely certified, on a loan-by-loan basis, that it had complied with HUD rules and that the mortgages it endorsed were eligible for FHA insurance under HUD rules.  If HUD had known

that MortgageIT's mortgage eligibility certifications were false, HUD would not have permitted MortgageIT to endorse those loans for FHA insurance.

### A. MortgageIT Repeatedly Certified That It Conducted Due Diligence And Complied With HUD Rules

134.    Between 1999 and 2009, as a Direct Endorsement Lender, MortgageIT approved more than 39,000 mortgages for FHA insurance.

135.    For each mortgage, MortgageIT certified that it complied with all HUD rules, including HUD rules requiring due diligence.

### B. Contrary to MortgageIT's Certifications To HUD, MortgageIT Repeatedly Failed To Conduct Due Diligence In Accordance With HUD Rules

136.    Contrary to the certifications appearing on each and every mortgage endorsed by MortgageIT, MortgageIT engaged in a nationwide pattern of failing to conduct due diligence in accordance with HUD rules and with sound and prudent underwriting principles.

137.    MortgageIT knew that its certifications of compliance with HUD rules were false.

138.    In the alternative, in falsely certifying compliance with HUD rules, MortgageIT acted with deliberate ignorance and/or reckless disregard of the truth.

139.    In the alternative, MortgageIT's false certifications, as well as its failure to conduct due diligence in accordance with HUD rules, were reckless, grossly negligent, and/or negligent.

140.    MortgageIT's false certifications, as well as its failure to conduct due diligence in accordance with HUD rules, violated MortgageIT's duty of care to HUD.

141.    MortgageIT's false certifications, as well as its failure to conduct due diligence in accordance with HUD rules, violated MortgageIT's fiduciary obligations to HUD.

142.    This pattern of false certifications extended to MortgageIT's branches throughout the United States, as illustrated by the examples below.

### 1.    New York Example: The Center Street Property

143.    FHA case number 372-3209567 relates to a property on Center Street in Waterloo, New York (the "Center Street Property"). MortgageIT underwrote the mortgage for the Center Street Property, reviewed and approved it for FHA insurance, and certified that MortgageIT had conducted due diligence on the mortgage application (the "Center Street Mortgage Application"). The mortgage closed on or about June 27, 2002.

144.    Contrary to the MortgageIT certification, MortgageIT did not comply with HUD rules in reviewing and approving the Center Street Mortgage Application for FHA insurance. Instead, MortgageIT violated multiple HUD rules, including HUD 4155.1, Ch. 2, § 3, HUD 4155.1, Ch. 2, § 7(F), HUD 4155.1, Ch. 2, § 10(C), and HUD 4155.1, Ch. 3, § 1.

145.    MortgageIT's violation of HUD 4155.1, Ch. 2, § 10(C), illustrates one of the multiple HUD rules that MortgageIT violated in approving the Center Street Mortgage Application. HUD 4155.1, Ch. 2, § 10(C), provides that, in order to ensure that gift funds are not provided by a party to the sales transaction, the Direct Endorsement Lender must document gift funds with a gift letter, signed by the borrower, that specifies the amount of the gift and states that no repayment is required, and that the Direct Endorsement Lender must document the transfer of the funds from the donor to the borrower. Contrary to this rule, MortgageIT failed to document the gift funds with a letter signed by the borrower, stating the amount of the gift, or stating that repayment was not required, and MortgageIT failed to document that the transfer of the gift funds. In violating HUD 4155.1, Ch. 2, § 10(C), MortgageIT endorsed the Center Street

33

Mortgage Application without proof that the borrower closed with gift funds from a proper source rather than from, for instance, the seller.

146.    MortgageIT's false certification on the Center Street Mortgage Application was material and bore upon the likelihood that borrower would make mortgage payments.

147.    Within two months after closing, the Center Street Mortgage went into default.

148.    As a result, HUD paid an FHA insurance claim of $80,198, including costs.

### 2.    Colorado Example: The Bittercreed Drive Property

149.    FHA case number 052-3466494 relates to a property on Bittercreed Drive in Colorado Springs, Colorado (the "Bittercreed Drive Property").  MortgageIT underwrote the mortgage for the Bittercreed Drive Property, reviewed and approved it for FHA insurance, and certified that MortgageIT had conducted due diligence on the mortgage application (the "Bittercreed Drive Mortgage Application").  The mortgage closed on or about June 29, 2004.

150.    Contrary to the MortgageIT certification, MortgageIT did not comply with HUD rules in reviewing and approving the Bittercreed Drive Mortgage Application for FHA insurance. Instead, MortgageIT violated multiple HUD rules, including HUD 4155.1, Ch. 2, § 3; HUD 4155.1, Ch. 2, § 10(C), HUD 4155.1, Ch. 3, § 1(E), and HUD 4155.1, Ch. 9, § 2(H)(2).

151.    MortgageIT's violation of HUD 4155.1, Ch. 2, § 3, illustrates one of the multiple HUD rules that MortgageIT violated in approving the Bittercreed Drive Mortgage Application. HUD 4155.1, Ch. 2, § 3, requires Direct Endorsement Lenders to develop a credit history for borrowers who do not have established credit histories.  Lenders must do so by assembling payment records for recurring expenses such as utilities, rentals, and automobile insurance. Contrary to this rule, MortgageIT failed to develop a credit history by assembling any such

34

records in reviewing the Bittercreed Drive Mortgage Application, even though the borrower had no established credit history (*i.e.*, lacked any credit score). In violating HUD 4155.1, Ch. 2, § 3, MortgageIT endorsed the Bittercreed Drive Mortgage Application without any measure of the borrower's creditworthiness based on past credit.

152.   MortgageIT's false certification on the Bittercreed Drive Mortgage Application was material and bore upon the likelihood that borrower would make mortgage payments.

153.   Within six months after closing, the Bittercreed Drive Mortgage went into default.

154.   As a result, HUD paid an FHA insurance claim of $190,977, including costs.

**3.   Indiana Example: The Monument Avenue Property**

155.   FHA case number 151-7978818 relates to a property on Monument Avenue in Portage, Indiana (the "Monument Avenue Property"). MortgageIT underwrote the mortgage for the Monument Avenue Property, reviewed and approved it for FHA insurance, and certified that MortgageIT had conducted due diligence on the mortgage application (the "Monument Avenue Mortgage Application"). The mortgage closed on or about November 4, 2005.

156.   Contrary to the MortgageIT certification, MortgageIT did not comply with HUD rules in reviewing and approving the Monument Avenue Mortgage Application for FHA insurance. Instead, MortgageIT violated multiple HUD rules, including HUD 4155.1, Ch. 2, § 3-1, HUD 4155.1, Ch. 2, § 4, HUD 4155.1, Ch. 2, § 10, and HUD 4155.1, Ch. 2, § 11.

157.   MortgageIT's violation of HUD 4155.1, Ch. 2, § 10, illustrates one of the multiple HUD rules that MortgageIT violated in approving the Monument Avenue Mortgage Application. HUD 4155.1, Ch. 2, § 10, requires Direct Endorsement Lenders to verify and document a borrowers' cash investment in a property. Contrary to this rule, MortgageIT failed to verify and

document the borrower's purported investment in the Monument Avenue Property; indeed, the documentation in the Monument Avenue Mortgage Application reveals that the borrower had documented assets of thousands of dollars less than the amount the borrower was purportedly investing in the property. In violating HUD 4155.1, Ch. 2, § 10, MortgageIT endorsed the Monument Avenue Mortgage Application without proof that the borrower contributed the purported investment to the closing.

158.    MortgageIT's false certification on the Monument Avenue Mortgage Application was material and bore upon the likelihood that borrower would make mortgage payments.

159.    Within nine months after closing, the Monument Avenue Mortgage went into default.

160.    As a result, HUD paid an FHA insurance claim of $143,302, including costs.

### 4.    Michigan Example: The Kentucky Street Property

161.    FHA case number 261-8886675 relates to a property on Kentucky Street in Dearborn, Michigan (the "Kentucky Street Property"). MortgageIT underwrote the mortgage for the Kentucky Street Property, reviewed and approved it for FHA insurance, and certified that MortgageIT had conducted due diligence on the mortgage application (the "Kentucky Street Mortgage Application"). The mortgage closed on or about February 15, 2005.

162.    Contrary to the MortgageIT certification, MortgageIT did not comply with HUD rules in reviewing and approving the Kentucky Street Mortgage Application for FHA insurance. Instead, MortgageIT violated multiple HUD rules, including HUD 4155.1, Ch. 3, § 1(E).

163.    MortgageIT's violation of HUD 4155.1, Ch. 3, § 1(E), illustrates one of the multiple HUD rules that MortgageIT violated in approving the Kentucky Street Mortgage

36

Application.  HUD 4155.1, Ch. 3, § 1(E) requires Direct Endorsement Lenders to verify current employment by telephone, and to record the name and telephone number of the person who verified employment on behalf of the employer.  Contrary to this rule, MortgageIT failed to contact the employer, and, after the mortgage closed, the listed employer verified that the borrower was never its employee.  In violating HUD 4155.1, Ch. 3, § 1(E), MortgageIT endorsed the Kentucky Street Mortgage Application based on unverified, and ultimately untrue, representations about the borrower's employment.

164.    MortgageIT's false certification on the Kentucky Street Mortgage Application was material and bore upon the likelihood that borrower would make mortgage payments.

165.    Within four months after closing, the Kentucky Street Mortgage went into default.

166.    As a result, HUD paid an FHA insurance claim of $199,119, including costs.

**5.    Oklahoma Example:  The Sixth Street Property**

167.    FHA case number 421-4018115 relates to a property on Southwest Sixth Street in Oklahoma City, Oklahoma (the "Sixth Street Property").  MortgageIT underwrote the mortgage for the Sixth Street Property, reviewed and approved it for FHA insurance, and certified that MortgageIT had conducted due diligence on the mortgage application (the "Sixth Street Mortgage Application").  The mortgage closed on or about January 2, 2004.

168.    Contrary to the MortgageIT certification, MortgageIT did not comply with HUD rules in reviewing and approving the Sixth Street Mortgage Application for FHA insurance. Instead, MortgageIT violated multiple HUD rules, including HUD 4155.1, Ch. 2, § 3, HUD 4155.1, Ch. 2, § 6, HUD 4155.1, Ch. 2, § 10(A), HUD 4155.1, Ch. 3, § 1(E), and HUD 4155.1, Ch. 3, § 1(F).

169.    MortgageIT's violation of HUD 4155.1, Ch. 2, § 10(A), illustrates one of the multiple HUD rules that MortgageIT violated in approving the Sixth Street Mortgage Application. HUD 4155.1, Ch. 2, § 10(A), requires that Direct Endorsement Lenders must verify the source of any earnest money deposits that appear excessive in relation to the borrower's savings by completing a verification of deposit, or by collecting bank statements, to document that the borrower had sufficient funds to cover the deposit. Contrary to this rule, MortgageIT obtained neither a verification of deposit nor bank statements for the Sixth Street Mortgage Application, even though the borrower's earnest money deposit was excessive in relation to his accumulate savings. Moreover, MortgageIT approved the mortgage for FHA insurance despite the fact that closing documents reveal that the borrower received, at closing, an amount exactly equal to the amount he purportedly provided as an earnest money deposit. In violating HUD 4155.1, Ch. 2, § 10(C), MortgageIT endorsed the Sixth Street Mortgage Application without proof that the borrower closed with his own funds rather than funds from, for instance, the seller.

170.    MortgageIT's false certification on the Sixth Street Mortgage Application was material and bore upon the likelihood that borrower would make mortgage payments.

171.    Within seven months after closing, the Sixth Street Mortgage went into default.

172.    As a result, HUD paid an FHA insurance claim of $122,666, including costs.

### 6.    Texas Example:  The Catalina Drive Property

173.    FHA case number 491-8308519 relates to a property on Catalina Drive in Lancaster, Texas (the "Catalina Drive Property"). MortgageIT underwrote the mortgage for the Catalina Drive Property, reviewed and approved it for FHA insurance, and certified that

MortgageIT had conducted due diligence on the mortgage application (the "Catalina Drive Mortgage Application"). The mortgage closed on or about March 31, 2004.

174.    Contrary to the MortgageIT certification, MortgageIT did not comply with HUD rules in reviewing and approving the Catalina Drive Mortgage Application for FHA insurance. Instead, MortgageIT violated multiple HUD rules, including HUD 4155.1, Ch. 2, § 4(A)(1) and HUD Handbook 4000.4, Rev-1 CHG-2 (1994) ("HUD 4000.4"), Ch. 2, § 4(C)(5).

175.    MortgageIT's violation of HUD 4000.4, Ch. 2, § 4(C)(5), illustrates one of the multiple HUD rules that MortgageIT violated in approving the Catalina Drive Mortgage Application. HUD 4155.1, Ch. 2, § 4(C) requires Direct Endorsement Lender to be aware of the warning signs of fraud by examining irregularities presented in mortgage applications. Contrary to this rule, MortgageIT failed to reconcile a purported verification of employment (*i.e.*, a document required for the file), which represented that the borrower worked at Employer X from 2002 through 2004, with conflicting records in the same file, which contradicted that verification and documented that the borrower had, in fact, worked at Employer Y from 2003 through 2004. In violating HUD 4155.1, Ch. 2, § 4(C)(5) , MortgageIT endorsed the Catalina Drive Mortgage Application without verifying the employment history of the borrower.

176.    MortgageIT's false certification on the Catalina Drive Mortgage Application was material and bore upon the likelihood that borrower would make mortgage payments.

177.    Within five months after closing, the Catalina Drive Mortgage went into default.

178.    As a result, HUD paid an FHA insurance claim of $126,683, including costs.

**C.**    **The False Certifications By MortgageIT Has Caused HUD To Pay Hundreds Of Millions Of Dollars In Insurance Claims Thus Far**

179.    HUD has paid thousands of insurance claims relating to mortgages insured by FHA based on MortgageIT's false certifications of due diligence, similar to the examples set forth in the previous section of this Complaint.  HUD would not have made a financial commitment to pay such mortgage insurance claims absent MortgageIT's false certifications.

180.    MortgageIT's false certifications, similar to the examples set forth in the previous section of this Complaint, were material and bore upon the likelihood that borrowers would make mortgage payments.

181.    As of February 2011, HUD has paid more than $386 million in FHA insurance claims and related costs arising out of MortgageIT's approval of mortgages for FHA insurance. Many of those claims arose out of FHA mortgage insurance provided by HUD based on MortgageIT's false certifications of due diligence.

182.    HUD expects to pay at least hundreds of millions of dollars in additional FHA insurance claims as additional mortgages underwritten by MortgageIT default in the months and years ahead.  Many of those future claims will arise out of FHA mortgage insurance provided by HUD based on MortgageIT's false certifications of due diligence.

## FIRST CLAIM

### Violations of the False Claims Act
### (31 U.S.C. § 3729(a)(1) (2006), and as amended, 31 U.S.C. § 3729(a)(1)(A))
### Causing False Claims

183.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

184.    The Government seeks relief against Deutsche Bank and MortgageIT under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. § 3729(a)(1) (2006), and, as amended, Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

185.    As set forth above, Deutsche Bank and MortgageIT knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented and/or caused to be presented, to an officer or employee of the Government, false and fraudulent claims for payment or approval in connection with its endorsement of FHA-insured mortgages.

186.    The Government paid insurance claims, and incurred losses, relating to FHA-insured mortgages wrongfully endorsed by MortgageIT because of Deutsche Bank's and MortgageIT's wrongful conduct.

187.    By reason of the false claims of Deutsche Bank and MortgageIT, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## SECOND CLAIM

### Violations of the False Claims Act
### (31 U.S.C. § 3729(a)(1)(B))
### Use of False Statements

188.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

189.    The Government seeks relief against Deutsche Bank and MortgageIT under Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), or, in the alternative, under Section 3729(a)(2) of the False Claims Act, 31 U.S.C. § 3729(a)(1) (2006).

41

190.    As set forth above, Deutsche Bank and MortgageIT knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims in connection with MortgageIT's endorsement of FHA-insured mortgages.

191.    The Government paid insurance claims, and incurred losses, relating to FHA-insured mortgages wrongfully endorsed by MortgageIT because of Deutsche Bank's and MortgageIT's wrongful conduct.

192.    By reason of the false records and/or statements of Deutsche Bank and MortgageIT, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## THIRD CLAIM

### Violations of the False Claims Act
### (31 U.S.C. § 3729(a)(7) (2006), and as amended, 31 U.S.C. § 3729(a)(1)(G))
### Reverse False Claims

193.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

194.    The Government seeks relief against Deutsche Bank and MortgageIT under Section 3729(a)(7) of the False Claims Act, 31 U.S.C. § 3729(a)(7) (2006), and, as amended, Section 3729(a)(1)(G) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

195.    As set forth above, Deutsche Bank and MortgageIT knowingly made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

196.     The Government paid insurance claims, and incurred losses, relating to FHA-insured mortgages wrongfully endorsed by MortgageIT because of Deutsche Bank's and MortgageIT's wrongful conduct.

197.     By virtue of the false records or statements made by Deutsche Bank and MortgageIT, the Government suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, and a civil penalty as required by law for each violation.

## FOURTH CLAIM

### Breach of Fiduciary Duty

198.     The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

199.     Deutsche Bank and MortgageIT were fiduciaries of the Government, and owed the Government fiduciary duties.

200.     As fiduciaries, Deutsche Bank and MortgageIT had a duty to act for, and give advice to, the Government for the benefit of the Government as to whether mortgages should be insured by FHA under the Direct Endorsement Lender program.

201.     As fiduciaries, Deutsche Bank and MortgageIT had a duty of *uberrmiae fidea*, or, the obligation to act in the utmost good faith, candor, honesty, integrity, fairness, undivided loyalty, and fidelity in their dealings with the Government.

202.     As fiduciaries, Deutsche Bank and MortgageIT had a duty to refrain from taking advantage of the Government by the slightest misrepresentation, to make full and fair disclosures

to the Government of all material facts, and to take on the affirmative duty of employing reasonable care to avoid misleading the Government in all circumstances.

203.    As fiduciaries, Deutsche Bank and MortgageIT had a duty to exercise sound judgment, prudence, and due diligence on behalf of the Government in endorsing mortgages for FHA insurance.

204.    As set forth above, Deutsche Bank and MortgageIT breached its fiduciary duties to the Government.

205.    As a result of the breach of the fiduciary duties of Deutsche Bank and MortgageIT to the Government, the Government has paid insurance claims, and incurred losses, relating to FHA-insured mortgages endorsed by MortgageIT.

206.    As a result of the breach of the fiduciary duties of Deutsche Bank and MortgageIT to the Government, the Government will pay future insurance claims, and incur future losses, relating to FHA-insured mortgages endorsed by MortgageIT.

207.    By virtue of the above, the Government is entitled to compensatory and punitive damages, in an amount to be determined at trial.

## FIFTH CLAIM

### Gross Negligence

208.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

209.    Deutsche Bank and MortgageIT owed the Government a duty of reasonable care and a duty to conduct due diligence.

44

210.    As set forth above, Deutsche Bank and MortgageIT breached its duties to the Government.

211.    As set forth above, Deutsche Bank and MortgageIT recklessly disregarded their duties to the Government.

212.    As a result of the gross negligence of Deutsche Bank and MortgageIT, the Government has paid insurance claims, and incurred losses, relating to FHA-insured mortgages endorsed by MortgageIT.

213.    As a result of the gross negligence of Deutsche Bank and MortgageIT, the Government will pay future insurance claims, and incur future losses, relating to FHA-insured mortgages endorsed by MortgageIT.

214.    By virtue of the above, the Government is entitled to compensatory and punitive damages, in an amount to be determined at trial.

## SIXTH CLAIM

### Negligence

215.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

216.    Deutsche Bank and MortgageIT owed the Government a duty of reasonable care and a duty to conduct due diligence.

217.    As set forth above, Deutsche Bank and MortgageIT breached its duties to the Government.

218.   As a result of the negligence of Deutsche Bank and MortgageIT, the Government has paid insurance claims, and incurred losses, relating to FHA-insured mortgages endorsed by MortgageIT.

219.   As a result of the negligence of Deutsche Bank and MortgageIT, the Government will pay future insurance claims, and incur future losses, relating to FHA-insured mortgages endorsed by MortgageIT.

220.   By virtue of the above, the Government is entitled to compensatory damages, in an amount to be determined at trial.

## SEVENTH CLAIM

### Indemnification

221.   The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

222.   Deutsche Bank and MortgageIT owed the Government a duty of reasonable care and a duty to conduct due diligence.

223.   As set forth above, Deutsche Bank and MortgageIT breached its duties to the Government.

224.   As a result of the breach of the duties of Deutsche Bank and MortgageIT to the Government, the Government has paid insurance claims, and incurred losses, relating to FHA-insured mortgages endorsed by MortgageIT.

225.   As a result of the breach of the duties of Deutsche Bank and MortgageIT to the Government, the Government will pay future insurance claims, and incur future losses, relating to FHA-insured mortgages endorsed by MortgageIT.

46

226.    By virtue of the above, the Government is entitled to indemnification of its losses relating to FHA-insured mortgages endorsed by MortgageIT.

WHEREFORE, the Government respectfully requests that judgment be entered in its favor and against Deutsche Bank and MortgageIT as follows:

a.    For treble the Government's damages for past claims paid by the Government, in an amount to be determined at trial;

b.    For compensatory damages for past claims paid, and future claims expected to be paid, by the Government, in an amount to be determined at trial, and, in the alternative, for indemnification;

c.    For such civil penalties as are required by law;

d.    For punitive damages;

e.    For an award of costs pursuant to 31 U.S.C. § 3729(a); and

f.    For an award of any such further relief as is proper.

Dated: New York, New York
        May 3, 2011

                                         PREET BHARARA
                                         United States Attorney for the
                                         Southern District of New York
                                         Attorney for the United States

By: _____
                                         BRIAN M. FELDMAN
                                         Assistant United States Attorney
                                         86 Chambers Street, Third Floor
                                         New York, New York  10007
                                         Telephone No. (212) 637-2777
                                         Facsimile No. (212) 637-2717
                                         Brian.Feldman@usdoj.gov