DECHERT LLP
Andrew J. Levander
Cheryl A. Krause
Michael H. Park
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500
*Attorneys for Defendants*
*Deutsche Bank AG and MortgageIT, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                Plaintiff,

     -against-

DEUTSCHE BANK AG and MORTGAGEIT, INC.,

              Defendants.

11 Civ. 2976 (LAK)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 3

A.   Deutsche Bank Acquired MortgageIT Not Long Before It Ceased Operations ............ 3

B.   HUD Operates the Direct Endorsement Lender Program
     To Encourage Home Ownership.............................................................................. 4

C.   HUD Was Long Aware of MortgageIT's Alleged Deficiencies
     and Continued Insuring MortgageIT Loans.............................................................. 7

D.   The Complaint Purports To Assert Claims Based on
     MortgageIT's Annual DEL and Loan Certifications ................................................... 8

ARGUMENT ...................................................................................................... 10

I.   LEGAL STANDARDS ................................................................................... 10

II.  THE COMPLAINT FAILS TO STATE A CLAIM
     AGAINST DEUTSCHE BANK...................................................................... 13

     A.   The Complaint Alleges No Basis for Pre-Acquisition Liability
          Against Deutsche Bank...................................................................... 14

     B.   The Complaint Alleges No Basis for Post-Acquisition Liability
          Against Deutsche Bank...................................................................... 14

          1.   The Complaint Alleges No Basis for Direct Liability
               Against Deutsche Bank............................................................. 14

          2.   The Complaint Alleges No Basis for Secondary Liability
               Against Deutsche Bank............................................................. 17

III. THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE FCA
     AGAINST DEUTSCHE BANK OR MORTGAGEIT.......................................... 18

     A.   The Complaint Fails To State a Claim Based on
          MortgageIT's Annual DEL Certifications .............................................. 19

          1.   MortgageIT's Annual DEL Certifications Were
               Conditions of Participation, Not Claims for Payment ................... 19

          2.   MortgageIT's Annual DEL Certifications Were Not
               Material to Any Payment Decisions by the Government ............... 22

          3.   MortgageIT's Annual DEL Certifications Were Not
               Knowingly False ...................................................................... 24

          4.   MortgageIT's Annual DEL Certifications Did Not
               Cause Any Losses Incurred by the Government ......................... 28

B.      The Complaint Fails Adequately To Plead a Claim
Under Rule 9(b) Based on MortgageIT's Loan Certifications ........................ 31

          1.      The Complaint Pleads No Facts with Respect to
All But Six of the 39,000 Loan Certifications at Issue ........................ 31

          2.      The Complaint Fails Adequately To Plead
Any Claim with Respect to the Six Loan
Certifications Mentioned in the Complaint ............................................ 35

C.      Count III Fails To State a Reverse False Claim ................................................. 36

IV.     MANY OF THE CLAIMS ON WHICH THE COMPLAINT IS BASED
ARE TIME-BARRED .................................................................................................. 37

A.      FCA Counts Based on Claims Before November 15, 2004
Are Time-Barred ............................................................................................... 37

B.      Many of the Common Law Claims Are Time-Barred .................................... 39

V.      THE COMPLAINT FAILS TO STATE CLAIMS UNDER COMMON LAW ......... 39

A.      There Is No Basis on Which To Resort to Federal Common Law ................. 40

B.      The Purported Common Law Claims Suffer from
the Same Fatal Defects as the FCA Claims ..................................................... 41

C.      The Complaint Fails To Plead the Elements of
the Purported Common Law Claims ................................................................. 41

          1.      The Complaint Fails To State Any Basis on Which
Defendants Owed the Government a Fiduciary Duty .......................... 42

          2.      The Complaint Fails Adequately To Allege Claims
Based on Gross Negligence or Negligence ........................................... 42

          3.      Indemnification Claims Not Covered by Express
Indemnification Agreements Should Be Dismissed ............................ 44

D.      Common Law Counts Based on Insurance Claims
That Have Yet To Be Paid Are Not Ripe ......................................................... 45

CONCLUSION .................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Ackerman v. Nw. Mut. Life Ins. Co.*,
    172 F.3d 467 (7th Cir. 1999) .................................................................................... 31

*Allison Engine Co. v. United States ex rel. Sanders*,
    553 U.S. 662, 128 S. Ct. 2123 (2008) ...................................................................... 22

*Am. Elec. Power Co. v. Connecticut*,
    No. 10-174, 2011 WL 2437011 (U.S. June 20, 2011) ................................................ 40, 41

*Amset Cable Ltd. v. Cablevision of Conn. Ltd. P'ship*,
    6 F.3d 867 (2d Cir. 1993) ......................................................................................... 45

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451, 126 S. Ct. 1991 (2006) ...................................................................... 28

*Apex Maritime Co. v. OHM Enters, Inc.*,
    No. 10-8119, 2011 WL 1226377 (S.D.N.Y. Mar. 31, 2011) ...................................... 12

*Armored Group, LLC v. Homeland Sec. Strategies, Inc.*,
    No. 07-9694, 2009 WL 1110783 (S.D.N.Y. Apr. 21, 2009) ...................................... 45

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) .................................................................................... 11, 14, 41

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 127 S. Ct. 1955 (2007) ................................................................ 11, 41

*Blusal Meats, Inc. v. United States*,
    638 F. Supp. 824 (S.D.N.Y. 1986), *aff'd*, 817 F.2d 1007 (2d Cir. 1987) .................. 39

*City of New York v. Black & Veatch*,
    No. 95-1299, 1997 WL 624985 (S.D.N.Y. Oct. 6, 1997) ......................................... 44

*Colnaghi, U.S.A., Ltd. v. Jewelers Protection Servs. Ltd.*,
    611 N.E.2d 282, 595 N.Y.S. 381 (1993) ................................................................. 43

*Commercial Union Ins. Co. v. Flagship Marine Servs.*,
    190 F.3d 26 (2d Cir. 1999) ....................................................................................... 42

*Curiale v. Reissman*,
    798 F. Supp. 141 (S.D.N.Y. 1992) ........................................................................... 42

*Decker v. Massey-Ferguson, Ltd.*,
    681 F.2d 111 (2d Cir. 1982) ..................................................................................... 35

*DiVittorio v. Equidyne Extractive Indus., Inc.,*
   822 F.2d 1242 (2d Cir. 1987)........................................................................ 13

*Dura Pharms., Inc. v. Broudo,*
   544 U.S. 336, 125 S. Ct. 1627 (2005)............................................................. 28

*Ganino v. Citizens Utilities Co.,*
   228 F.3d 154 (2d Cir. 2000).......................................................................... 23

*Haas v. Gutierrez,*
   No. 07-3623, 2008 WL 2566634 (S.D.N.Y. June 26, 2008) ........................... 37

*Hagood v. Sonoma County Water Agency,*
   81 F.3d 1465 (9th Cir. 1996) ........................................................................ 26

*Holowecki v. Fed. Express Corp.,*
   440 F.3d 558 (2d Cir. 2006), *aff'd*, 552 U.S. 389, 128 S. Ct. 1147 (2008) ...... 15

*Home Ins. Co. v. Am. Home Prods. Corp.,*
   550 N.E.2d 930, 551 N.Y.S.2d 481 (1990)...................................................... 43

*In re Pharm. Indus. Average Wholesale Price Litig.,*
   538 F. Supp. 2d 367 (D. Mass. 2008) ............................................................ 17

*Janus Capital Group, Inc. v. First Derivative Traders,*
   131 S. Ct. 2296 (2011).......................................................................... 13, 22

*Kushner v. Beverly Enters., Inc.,*
   317 F.3d 820 (8th Cir. 2003) ........................................................................ 26

*Madonna v. United States,*
   878 F.2d 62 (2d Cir. 1989)............................................................................ 12

*Maine State Ret. Sys. v. Countrywide Fin. Corp.,*
   No. 10-0302, 2011 WL 1765509 (C.D. Cal. Apr. 20, 2011) ........................... 17

*Mikes v. Strauss,*
   274 F.3d 687 (2d Cir. 2001) .................................................................*passim*

*Mills v. Polar Molecular Corp.,*
   12 F.3d 1170 (2d Cir. 1993).......................................................................... 33

*Milwaukee v. Illinois,*
   451 U.S. 304, 101 S. Ct. 1784 (1981)...................................................... 40, 41

*Mobil Oil Corp. v. Higginbotham,*
   436 U.S. 618, 98 S. Ct. 2010 (1978).............................................................. 41

*New Hampshire Ins. Co. v. C'est Moi, Inc.*,
   519 F.3d 937 (9th Cir. 2008) ......................................................................... 42

*O'Brien v. Nat'l Prop. Analysts Partners*,
   936 F.2d 674 (2d Cir. 1991).................................................................... 12, 35

*Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*,
   893 F. Supp. 285 (S.D.N.Y. 1995) ............................................................... 42

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007)............................................................................ 4

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)......................................................................... 12

*SEC v. Morgan Keegan & Co.*,
   No. 09-1965, 2011 WL 2559362 (N.D. Ga. June 28, 2011).......................... 34

*Structural Maint. & Contracting Co. v. Jayce Enters., Inc.*,
   No. 09-8187, 2010 WL 4159517 (S.D.N.Y. Oct. 12, 2010)........................... 42

*United States ex rel. Atkins v. McInteer*,
   470 F.3d 1350 (11th Cir. 2006) ................................................................... 12

*United States ex rel. Becker v. Westinghouse Savannah River Co.*,
   305 F.3d 284 (4th Cir. 2002) ....................................................................... 27

*United States ex rel. Burlbaw v. Orenduff*,
   548 F.3d 931 (10th Cir. 2008) ..................................................................... 27

*United States ex rel. Butler v. Hughes Helicopter Co.*,
   No. 89-5760, 1993 WL 841192 (C.D. Cal. Aug. 25, 1993) .......................... 29

*United States ex rel. Clausen v. Lab. Corp. of Am.*,
   290 F.3d 1301 (11th Cir. 2002) ................................................................... 36

*United States ex rel. Colucci v. Beth Israel Med. Ctr.*,
   No. 06-5033, 2011 WL 1226267 (S.D.N.Y. Mar. 31, 2011)...................... 24, 26

*United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*,
   543 F.3d 1211 (10th Cir. 2008) .......................................................... 19, 20, 21

*United States ex rel. Costner v. United States*,
   317 F.3d 883 (8th Cir. 2003) ....................................................................... 22

*United States ex rel. Cox v. Iowa Health Sys.*,
   29 F. Supp. 2d 1022 (S.D. Iowa 1998) .................................................... 32, 33

*United States ex rel. Driscoll v. Serono, Inc.,*
  No. 00-11680, 2008 WL 728939 (D. Mass. Mar. 18, 2008) ............................... 12

*United States ex rel. Gross v. AIDS Research Alliance-Chi.,*
  415 F.3d 601 (7th Cir. 2005) ........................................................................... 19

*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.,*
  498 F. Supp. 2d 25 (D.D.C. 2007) ............................................................... 13, 16

*United States ex rel. Hopper v. Anton,*
  91 F.3d 1261 (9th Cir. 1996) ........................................................................... 36

*United States ex rel. J. Cooper & Assocs. v. Bernard Hodes Group, Inc.,*
  422 F. Supp. 2d 225 (D.D.C. 2006) .................................................................. 27

*United States ex rel. Jajdelski v. Kaplan, Inc.,*
  No. 05-1054, 2010 WL 2326069 (D. Nev. June 7, 2010) ................................... 13

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.,*
  985 F.2d 1148 (2d Cir. 1993) ........................................................................... 38

*United States ex rel. Lamers v. City of Green Bay,*
  168 F.3d 1013 (7th Cir. 1999) ..................................................................... 23, 35

*United States ex rel. Lindsey v. Easter Seals UCP N.C., Inc.,*
  No. 06-125, 2007 WL 3124664 (W.D.N.C. Oct. 25, 2007) ............................... 32

*United States ex rel. Loughren v. Unum Group,*
  613 F.3d 300 (1st Cir. 2010) ........................................................................... 25

*United States ex rel. Mikes v. Straus,*
  98 F. Supp. 2d 517 (S.D.N.Y. 2000) ................................................................ 27

*United States ex rel. Pervez v. Beth Israel Med. Ctr.,*
  736 F. Supp. 2d 804 (S.D.N.Y. 2010) .........................................................*passim*

*United States ex rel. Thomas v. Siemens AG,*
  708 F. Supp. 2d 505 (E.D. Pa. 2010) ............................................................... 17

*United States ex rel. Tillson v. Lockheed Martin Energy Sys., Inc.,*
  No. 00-39, 2004 WL 2403114 (W.D. Ky. Sept. 30, 2004) ................................. 16

*United States ex rel. Vallejo v. Investronica, Inc.,*
  2 F. Supp. 2d 330 (W.D.N.Y. 1998) ............................................................ 33, 34

*United States ex rel. Vigil v. Nelnet, Inc.,*
  639 F.3d 791 (8th Cir. 2011) ................................................................. 21, 22, 36

*United States v. Cent. Soya, Inc.,*
    697 F.2d 165 (7th Cir. 1982) ........................................................................39

*United States v. Crescent City, E.M.S., Inc.,*
    151 F.R.D. 288 (E.D. La. 1993)....................................................................33

*United States v. Eghbal,*
    548 F.3d 1281 (9th Cir. 2008) ......................................................................29

*United States v. Ekelman & Assocs., Inc.,*
    532 F.2d 545 (6th Cir. 1976) ..................................................................24, 25

*United States v. First Nat'l Bank of Cicero,*
    957 F.2d 1362 (7th Cir. 1992) ......................................................................28

*United States v. Hibbs,*
    568 F.2d 347 (3d Cir. 1977)..........................................................................28

*United States v. Inc. Vill. of Island Park,*
    888 F. Supp. 419 (E.D.N.Y. 1995) ...............................................................44

*United States v. Kimbell Foods, Inc.,*
    440 U.S. 715, 99 S. Ct. 1448 (1979).............................................................40

*United States v. McNinch,*
    356 U.S. 595, 78 S. Ct. 950 (1958)...................................................10, 11, 18

*United States v. NHC Healthcare Corp.,*
    115 F. Supp. 2d 1149 (W.D. Mo. 2000) ........................................................11

*United States v. Q Int'l Courier, Inc.,*
    131 F.3d 770 (8th Cir. 1997) ........................................................................37

*United States v. Rapoport,*
    514 F. Supp. 519 (S.D.N.Y. 1981) ...............................................................28

*United States v. Skidmore, Owings & Merrill,*
    505 F. Supp. 1101 (S.D.N.Y. 1981)..............................................................39

*United States v. Southland Mgmt. Corp.,*
    326 F.3d 669 (5th Cir. 2003) ........................................................................22

*Wal-Mart Stores, Inc. v. Dukes,*
    No. 10-277, 2011 WL 2437013 (U.S. June 20, 2011)...........................32, 34, 41

*Wood ex rel. United States v. Applied Research Assocs., Inc.,*
    328 Fed. App'x 744 (2d Cir. 2009).................................................................37

**Statutes**

12 U.S.C. § 1708 (2006) ................................................................................ 6, 23, 44

28 U.S.C. § 2415 (2006) ........................................................................................ 39

31 U.S.C. § 3729 (2006) .................................................................................. *passim*

31 U.S.C. § 3731 (2006) ........................................................................................ 38

31 U.S.C. § 3801 *et seq.* ....................................................................................... 41

Fed. R. Civ. P. 9(b) ......................................................................................... *passim*

Fraud Enforcement and Recovery Act of 2009,
   Pub. L. No. 111-21, 123 Stat. 1617 (2009) ...................................................... 18

**Other Authorities**

24 C.F.R. § 25.2 ............................................................................................ 7, 21 24

24 C.F.R. § 25.5 ............................................................................................. 7 21 24

24 C.F.R. § 25.6 ............................................................................................. 7 21 24

24 C.F.R. § 30.35 ..................................................................................................... 7

24 C.F.R. § 201.54 ................................................................................................... 7

24 C.F.R. § 202.3 ..................................................................................................... 5

24 C.F.R. § 202.5 ..................................................................................................... 6

24 C.F.R. § 203.1 ............................................................................................ 41, 42

24 C.F.R. § 203.3 ....................................................................... 7, 20, 23, 41, 42

24 C.F.R. § 203.5 ............................................................................................ 41, 42

HUD Handbook No. 4060.1, *available at* http://portal.hud.gov/hudportal/
   HUD?src=/program_offices/administration/hudclips/handbooks/hsgh/4060.1 ............ 6, 16

HUD Press Release, *HUD Announces Higher FHA Loan Limits To Help
   More American Families Become Homeowners* (Jan. 3, 2006),
   *available at* http://archives.hud.gov/news/2006/pr06-001.cfm ........................................... 4

HUD-OIG Memorandum, *An Underwriting Review of 15 FHA Lenders
    Demonstrated That HUD Missed Critical Opportunities To Recover
    Losses to the FHA Insurance Fund*, at 5 (Mar. 2, 2011),
    *available at* http://www.hudoig.gov/pdf/Internal/2011/ig11cf1801.pdf ............................ 5

S. Rep. No. 99-345, 99th Cong., 2d Sess.,
    *reprinted in* 1986 U.S.C.C.A.N. 5266 ............................................................................... 11

Defendants Deutsche Bank AG ("Deutsche Bank") and MortgageIT, Inc. ("MortgageIT"), by and through their attorneys, Dechert LLP, respectfully submit this memorandum of law in support of their motion to dismiss the government's Complaint.

## PRELIMINARY STATEMENT

Two years after MortgageIT concluded a decade of originating loans insured by the Federal Housing Administration ("FHA") of the U.S. Department of Housing and Urban Development ("HUD"), and amidst mounting pressure to prosecute cases against Wall Street banks in the wake of the financial crisis, the Justice Department initiated this lawsuit against MortgageIT and Deutsche Bank, the Germany-based bank that acquired MortgageIT in 2007. The government attempts to cast this dispute as a claim for treble damages under the False Claims Act ("FCA"), but neither the law nor the facts pleaded in the Complaint support such a claim. In particular, the government's case is fundamentally defective in two major respects.

First, the government takes aim at Deutsche Bank without any basis for doing so. Deutsche Bank acquired MortgageIT in 2007, shortly before it ceased its lending activities and well after the events that form the centerpiece of the Complaint. The government fails to allege any facts to support the legal conclusion that Deutsche Bank assumed MortgageIT's obligations at the time of acquisition or thereafter. Nor does the government allege that Deutsche Bank originated any FHA loans itself or that it sought or received payment from HUD on any FHA loans originated by MortgageIT. The Complaint alleges no basis for direct or derivative liability against Deutsche Bank, which should thus be dismissed from this action.

Second, the government's expansive theory of FCA liability has been squarely rejected by the Second Circuit. Specifically, the government does not attempt to limit its allegations to particular loans that were purposefully processed by MortgageIT with supposed knowledge that

1

such loans did not qualify for FHA insurance. Instead, it indiscriminately challenges every single one of tens of thousands of FHA loans originated by MortgageIT—including loans that indisputably qualified for FHA insurance—because MortgageIT allegedly did not have a fully-compliant quality control program. According to the government, this rendered false the annual certification ("Annual DEL Certification") made by a MortgageIT officer that, to the best of his knowledge, MortgageIT complied with the requirements to be a Direct Endorsement Lender ("DEL"), which subsequently gave MortgageIT the authority to approve specific mortgage loans for FHA insurance without prior submission to HUD. Not surprisingly, however, the FCA does not permit the government retroactively to revoke participation in a government program like the Direct Endorsement Lender Program ("DEL Program"), and in the process recover treble damages on any claims paid by the government during the period of participation, based on someone's allegedly false annual certification of compliance with program eligibility requirements. To the contrary, the law in the Second Circuit is clear that certifications of compliance with requirements of program participation are not "claims for payment" actionable under the FCA.

These two arguments alone are sufficient to dismiss all of the claims against Deutsche Bank and most of the claims against MortgageIT. In addition, there are numerous other problems with the government's Complaint that require dismissal of each and every claim against Deutsche Bank and MortgageIT, including the following:

- <u>No Materiality.</u> The Complaint fails to plead that the alleged quality control shortcomings were material to HUD's decision to insure MortgageIT loans and instead admits that HUD continued to insure loans while it was fully aware of the alleged quality control issues.

- <u>No Falsity or Knowledge.</u> The Complaint fails adequately to plead that certifications made "to the best of [one's] knowledge" were false because it

does not plead that the individuals who signed the certifications actually believed that they were false.

- <u>No Causation.</u>  The Complaint fails adequately to plead that MortgageIT's allegedly false certifications caused the government to suffer losses.

- <u>Inadequately Pleaded.</u>  The Complaint identifies only six specific loans out of thousands for which the government seeks treble damages and fails to plead the elements of fraud with particularity as to any loans, including those six examples from which it purports to extrapolate an alleged "nationwide pattern" of failing to conduct due diligence.

- <u>Time-Barred.</u>  The Complaint includes claims that were time-barred when Defendants entered into a tolling agreement with the government on November 15, 2010.

- <u>No Common Law Claims.</u>  The common law claims are precluded by the extensive statutory and administrative remedies available to the government, suffer from some of the same defects as the FCA claims, and are otherwise unfounded.

In sum, the Complaint is long on unsupported and conclusory rhetoric but short on facts and legal underpinnings.  It utterly fails to state any basis on which to hold Deutsche Bank liable for alleged conduct that occurred before it acquired MortgageIT and in which it had no involvement.  The government's expansive theories of liability under the FCA and common law are fundamentally unsound and fly in the face of well-settled precedent.  The government has failed to allege a single loan-level claim under any theory, much less the blunderbuss claims that seek treble damages on all of MortgageIT's FHA lending from its inception.  For all of these reasons, Defendants respectfully request that this Court dismiss the Complaint in its entirety with prejudice.

## STATEMENT OF FACTS

**A.**     **Deutsche Bank Acquired MortgageIT Not Long Before It Ceased Operations**

Since 1999, MortgageIT had participated as a Direct Endorsement Lender in the FHA's DEL Program.  *See* Complaint, Declaration of Michael H. Park ("Park Decl.") Ex. A ("Compl.")

¶¶ 18, 62.  Between then and 2009, "MortgageIT approved more than 39,000 mortgages for FHA insurance, totaling more than $5 billion in underlying principal obligations." *Id.* ¶ 65.  During that time period, "MortgageIT employed more than 2,000 people, had branches throughout the country, and was licensed to originate residential mortgages in all 50 states." *Id.* ¶ 18.

MortgageIT was acquired by Deutsche Bank in January 2007 and has been a wholly-owned, indirect subsidiary since then. *See id.*  On December 11, 2008, in the wake of the financial crisis, MortgageIT announced that it would cease accepting new loan applications after 2008. *See* MortgageIT Operational Change Announcement (Dec. 11, 2008), Park Decl. Ex. B.[1] MortgageIT formally withdrew from the DEL Program in October 2009.  *See* Compl. ¶ 63.

The Complaint does not allege that Deutsche Bank was a DEL or had any involvement in originating FHA insured loans.

**B.      HUD Operates the Direct Endorsement Lender Program
         To Encourage Home Ownership**

The FHA's stated purpose is to encourage home ownership, particularly for lower-income Americans.  The FHA provides mortgage insurance on loans made by FHA-approved lenders to borrowers who typically would not qualify for a conventional mortgage loan, often due to insufficient down-payment funds, insufficient income, prior credit delinquencies, and/or other factors indicative of a higher propensity to default.  Under the DEL Program, borrowers who otherwise might not qualify for a mortgage are able to obtain loans at low interest rates with as little as a 3.5% down payment.  HUD steadily increased the number and amount of FHA loans it insured in the years leading up to the housing crisis.[2]  Consequently, since the financial crisis,

---

[1]  The Court may take judicial notice of documents in the public record.  *See, e.g., Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

[2]  *See* HUD Press Release, *HUD Announces Higher FHA Loan Limits To Help More American Families Become Homeowners* (Jan. 3, 2006), *available at* http://archives.hud.gov/news/2006/pr06-001.cfm.

HUD has "experienced exponential growth in the dollar amount of single-family claims paid from the FHA insurance fund. From fiscal years 2007 through 2010, HUD experienced nearly a 174 percent increase in the dollar value of claims paid . . . from about $5.3 billion in 2007 to about $14.5 billion in 2010."[3]

Annual DEL Certifications and Loan Certifications. HUD operates the DEL Program, through which HUD delegates the review of applications for mortgage insurance to pre-approved DELs, which are authorized to endorse mortgages for FHA insurance without prior submission to HUD.

Participants in the DEL Program must meet certain requirements. Each year, a DEL is required to file with HUD an Annual DEL Certification in which a corporate officer verifies:

> "I know or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD/FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices." Compl. ¶ 54.

Each year, the Secretary of HUD determines "whether recertification, *i.e.*, continued approval, is appropriate." 24 C.F.R. §§ 202.3(b), 202.5(m). Thus, the Annual DEL Certification verifies that, to the best of the signatory's knowledge, the DEL continues to meet the specified requirements of eligibility sufficiently to participate in the DEL Program; there is nothing in the certification suggesting that the signatory is verifying that all of the lender's mortgage underwriting activities are in perfect compliance with all HUD regulations.

Pursuant to the DEL Program's requirements, a DEL must "implement a written quality control plan" to ensure compliance with HUD regulations governing mortgage origination or

---

[3] *See* HUD-OIG Memorandum, *An Underwriting Review of 15 FHA Lenders Demonstrated That HUD Missed Critical Opportunities To Recover Losses to the FHA Insurance Fund*, at 5 (Mar. 2, 2011), *available at* http://www.hudoig.gov/pdf/Internal/2011/ig11cf1801.pdf.

servicing. *See id.* § 202.5(h).  The relevant HUD Handbook sets forth the requirements for a quality control plan, allowing for "a degree of flexibility, so that each mortgagee may develop a program that fits its circumstances while conforming to FHA's requirements."  HUD Handbook No. 4060.1 § 7-1.  One aspect of quality control is a mandatory post-endorsement review of early payment defaults ("EPDs"), which are loans going into default (*i.e.*, more than 60 days delinquent) within the first six payments. *See id.* § 7-6(D).  The government concedes that MortgageIT had a quality control plan and was for years in dialogue with HUD about its efforts to improve its review of EPDs. *See, e.g.*, Compl. ¶¶ 75-79.

Separate and apart from the annual certification concerning compliance with FHA program requirements, for each endorsed mortgage, DELs must submit a certification signed by an individual who underwrote the loan verifying that the borrower's application complies with DEL Program requirements ("Loan Certification").  It states:

> "[T]he undersigned Direct Endorsement Underwriter certifies that I have personally reviewed the appraisal report (if applicable), credit application, and all associated documents and have used due diligence in underwriting this mortgage. I find that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program and I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4." *Id.* ¶ 59.

Finally, when a borrower defaults on an FHA-insured mortgage, the entity holding the mortgage may submit a claim to HUD for the costs associated with the defaulted mortgage. *See id.* ¶ 25.  To file a claim for reimbursement, the party must file a fully documented and itemized claim on a HUD-approved form. *See* 24 C.F.R. § 201.54(a).  Upon filing, the claimant assigns its entire interest in the loan to the government. *See id.* § 201.54(d).

HUD Oversight of DELs.  HUD regulations provide for administrative review and sanctions if a DEL fails to comply with program requirements.  HUD conducts routine audits of DELs' compliance with those program requirements, as it did with MortgageIT several times

6

during its tenure as a DEL. *See* Compl. ¶¶ 75-79. When a HUD audit indicates a compliance deficiency, HUD's Mortgagee Review Board ("MRB") is authorized to issue letters of reprimand, apply civil monetary penalties, suspend the DEL's approval, place a DEL on probation, or revoke a DEL's approval to participate in FHA programs. *See* 12 U.S.C. § 1708(c)(1); 24 C.F.R. §§ 25.2(b), 25.5(a)-(d), 30.35. Grounds for such actions include:

- "Failure to comply with any agreement, certification, undertaking, or condition of approval listed on, or applicable to, either a mortgagee's application for approval or a mortgagee's branch office notification," *id.* § 25.6(g);

- "[V]iolation of the requirements set forth in any statute, regulation, handbook, mortgagee letter, or other written rule or instruction," *id.* § 25.6(j); and

- "Submission of false information to HUD in connection with any HUD/FHA insured mortgage transaction," *id.* § 25.6(k).

In addition to these administrative tools, HUD may independently impose sanctions on a non-complying DEL, including probation or termination of DEL status, as well as on individual underwriters and brokers. *See id.* § 203.3(d).

## C.    HUD Was Long Aware of MortgageIT's Alleged Deficiencies and Continued Insuring MortgageIT Loans

As described in the Complaint, in three separate audits in 2003, 2004, and 2006, HUD purportedly found that MortgageIT was not adequately conducting the required EPD reviews. *See* Compl. ¶¶ 75-80. The Complaint alleges that in each instance, following a dialogue with HUD about the issue, MortgageIT promised to conduct the reviews going forward. *See id.* The Complaint further alleges that MortgageIT ultimately developed a plan, prior to its acquisition by Deutsche Bank, to outsource the EPD review process to a third party. *See id.*

The Complaint does not allege that HUD did anything more than "scold" MortgageIT for the alleged failure to conduct EPD reviews. *See id.* ¶ 79. Significantly, the Complaint does not allege that HUD conditioned its decision to insure loans on MortgageIT's review of EPDs. To

the contrary, even in the three separate periods between when HUD identified the issue in its audits and when it allegedly was told the issue was fixed (*i.e.*, during periods when it allegedly knew that MortgageIT was not adequately conducting EPD reviews), HUD continued to insure loans endorsed by MortgageIT.  Moreover, at no time did HUD choose to pursue significant disciplinary action against MortgageIT regarding these issues.  *See id.* ¶¶ 75-80.  Notably, the Complaint does not allege that HUD ever raised the EPD issue, or any other issue about MortgageIT, with Deutsche Bank.

**D.     The Complaint Purports To Assert Claims Based on MortgageIT's Annual DEL and Loan Certifications**

The government asserts claims under the FCA, *see* 31 U.S.C. §§ 3729(a)(1)(A), (B), (G), as well as common law claims for breach of fiduciary duty, gross negligence, negligence, and indemnification.  The primary factual basis for all of the claims is that employees of Defendants made two types of allegedly false certifications that eventually led or possibly will lead to the government having to pay insurance on defaulted mortgages.  First, the Complaint alleges that MortgageIT's Annual DEL Certifications falsely represented to HUD that MortgageIT was in compliance with HUD's quality control requirements.  *See* Compl. ¶¶ 10, 53-55.  Second, the Complaint alleges that "thousands" of unspecified Loan Certifications somehow falsely represented that the subject loans qualified for FHA insurance.  *See id.* ¶¶ 11, 56-60, 134-35.

The Annual DEL Certification Allegations.  MortgageIT officers allegedly made such certifications between 1999 and 2006, and Deutsche Bank officers allegedly did so between 2007 and 2009.  *See id.* ¶¶ 70-72.  The Complaint specifically identifies only two individuals, however, who signed Annual DEL Certifications on February 1, 2005 and February 6, 2009.  *See id.*  The remaining nine signatories who allegedly made fraudulent statements are not identified.  Even as to the Annual DEL Certifications whose signatories are identified, the Complaint fails to

allege that the signatories believed or recklessly disregarded the truth about whether MortgageIT was not in compliance with FHA requirements for DELs at the time they signed the certifications. Thus, it does not allege that the certifications made "to the best of [the signatory's] knowledge" were false at the time they were made.

Regarding Deutsche Bank, the Complaint alleges only that it supposedly submitted Annual DEL Certifications from 2007 to 2009. *See id.* ¶ 72. In accordance with HUD requirements, however, the certifications are plain on their face that they were submitted by MortgageIT, not Deutsche Bank, which was not a DEL. The Complaint seeks to draw a contrary inference from the allegation that the individual who signed the 2009 Annual DEL Certification was a Deutsche Bank Director. A more plausible inference, however, which also has the benefit of truth, is that the same person was also a MortgageIT Director and signed in that capacity.[4]

The factual allegations of the Complaint concern almost exclusively the pre-acquisition conduct of MortgageIT. *See id.* ¶¶ 75-178. Indeed, the Complaint alleges no post-acquisition conduct that would give rise to a claim against Deutsche Bank. Deutsche Bank acquired MortgageIT after all three HUD audits referenced in the Complaint had been conducted, and the Complaint is completely devoid of allegations that Deutsche Bank had any involvement in the purported quality control shortcomings. The Complaint does not allege that MortgageIT failed to conduct EPD reviews post-acquisition, let alone that Deutsche Bank played any role in any such decision. The Complaint further fails to allege that HUD brought any of its alleged concerns to Deutsche Bank's attention at the time of the acquisition or any time thereafter.

---

[4] As alleged in the Complaint, Joseph Swartz signed the 2009 certification. *See* Annual DEL Certification (Feb. 9, 2009), Park Decl. Ex. C; Compl. ¶ 72. Contrary to the allegations in the Complaint, however, Mr. Swartz was a Director of MortgageIT (as well as Deutsche Bank Securities Inc., another indirectly owned subsidiary of Deutsche Bank), but not Deutsche Bank.

The Loan Certification Allegations. The Complaint alleges that in Loan Certifications for "thousands" of mortgages that MortgageIT had endorsed over the ten-year period at issue, various of its employees scattered across the country who underwrote the loans certified falsely that they had conducted due diligence in accordance with HUD regulations. *See id.* ¶¶ 11, 56-60, 134-35. Critically, the Complaint does not identify the thousands of mortgages it alleges were insured as a result of false Loan Certifications, much less specify who signed the certifications, what is fraudulent about them, or how the government suffered any losses as a consequence. Nor does it allege that Deutsche Bank played any role in originating those mortgages.

Instead, the government bases its generalizations about thousands of loans on six examples of allegedly false Loan Certifications, all of which predate Deutsche Bank's acquisition of MortgageIT. *See id.* ¶¶ 142-78. But even those examples do not allege the identity of the individuals who made the allegedly false statements, that they did so knowingly, that the allegedly false statements and not some other factors caused the government's losses, or that Deutsche Bank played any role with respect to those loans.

## ARGUMENT

## I.   LEGAL STANDARDS

The False Claims Act. The government brings claims under three separate provisions of the FCA, which impose liability on any person who: "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1) (2006); "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(2); and "knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government, " *id.* § 3729(a)(7).

10

The terms of the FCA are to be read narrowly. The statute's provisions "must be carefully restricted, not only to their literal terms but to the evident purpose of Congress in using those terms, particularly where they are broad and susceptible to numerous definitions." *United States v. McNinch*, 356 U.S. 595, 598, 78 S. Ct. 950, 952 (1958). The purpose of the FCA was to stop "plundering of the public treasury," which had occurred during the Civil War when "the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war." *Id.* at 599, 78 S. Ct. at 953. Accordingly, courts have noted that the FCA "was not designed to reach every kind of fraud practiced on the Government." *Id.*

The government has long recognized the power of the FCA as an enforcement tool due to its treble damages provision. The legislative history of the 1986 amendments to the FCA, which increased the recoverable damages from double to treble, makes clear that the Act "is a much more powerful tool in deterring fraud" than common-law remedies because of its treble damages provision. S. Rep. No. 99-345, at 4, 17 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5269, 5282; *see United States v. NHC Healthcare Corp.*, 115 F. Supp. 2d 1149, 1152 (W.D. Mo. 2000) (noting the "FCA's powerful threats of significant fines, treble damages, and costly litigation fees" and questioning "whether the Government's movement towards increased scrutiny of care facilities through FCA lawsuits is a bona fide exercise of prosecutorial resources or an improper expansion of this powerful Act").

Motion To Dismiss. To survive a motion to dismiss, a complaint must satisfy a "plausibility standard," *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), which requires "factual allegations sufficient 'to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007). A complaint must provide "more

than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citation omitted).

Rule 9(b). Because "[i]t is self-evident that the FCA is an anti-fraud statute . . . claims brought under the FCA fall [also] within the express scope of Rule 9(b)." *United States ex rel. Pervez v. Beth Israel Med. Ctr.*, 736 F. Supp. 2d 804, 810 (S.D.N.Y. 2010) (Kaplan, J.) (citation omitted). In addition to the normal pleading requirements, Rule 9(b) requires that allegations of fraud "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "[W]hile Rule 9(b) permits scienter to be demonstrated by inference, this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. An ample factual basis must be supplied to support the charges." *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (internal quotation omitted).[5]

A fraud claim must plead with specificity, setting forth: (1) the statement that allegedly was false or fraudulent, (2) the speaker, (3) where and when the statement was made, and (4) the reason the statement was fraudulent. *See Rombach*, 355 F.3d at 170. It is not enough for a complaint to allege "schemes and other wrongful activities" because generalities of that nature "invariably are inadequate unless they are linked to allegations, stated with particularity, of the actual false claims submitted to the [federal] government that constitute the essential element of an FCA qui tam action." *United States ex rel. Driscoll v. Serono, Inc.*, No. 00-11680, 2008 WL 728939, at *2 (D. Mass. Mar. 18, 2008) (citation omitted). Courts have held that Rule 9(b)'s

---

[5] As the Second Circuit has explained, Rule 9(b)'s strict pleading requirement furthers at least three significant policies: (1) to ensure that the defendant has "fair notice of a plaintiff's claim"; (2) "to safeguard a defendant's reputation from improvident charges of wrongdoing"; and (3) "to protect a defendant against the institution of a strike suit." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (citation omitted). The Rule also has the salutary effect of "discourag[ing] the filing of complaints as a pretext for discovery of unknown wrongs." *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989) (internal quotation omitted).

particularity requirement is "especially important" in light of the FCA's treble damages

provision. *See United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2006).

"Where multiple defendants are asked to respond to allegations of fraud, the complaint

should inform each defendant of the nature of his alleged participation in the fraud." *See Apex*

*Maritime Co. v. OHM Enters, Inc.*, No. 10-8119, 2011 WL 1226377, at *2 (S.D.N.Y. Mar. 31,

2011) (citing *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

If a complaint alleging FCA claims fails to meet these heightened pleading requirements, it

should be dismissed for failure to state a claim. *See Pervez*, 736 F. Supp. 2d at 813.

## II.    THE COMPLAINT FAILS TO STATE A CLAIM AGAINST DEUTSCHE BANK

The government has overreached by naming Deutsche Bank in this lawsuit concerning

the mortgage underwriting activities of MortgageIT, which Deutsche Bank acquired in 2007.  To

state a claim under the FCA, the Complaint must allege either that Deutsche Bank is directly

liable for its own role in the submission of false claims, or is liable under a veil-piercing or alter

ego theory. *See United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp.

2d 25, 60 (D.D.C. 2007); *see also Janus Capital Group, Inc. v. First Derivative Traders*, 131

S. Ct. 2296, 2304 (2011) (declining plaintiff's "invitation to disregard the corporate form" in a

suit under a federal anti-fraud statute). The Complaint does neither.  First, it pleads no basis for

liability for any pre-acquisition conduct by Deutsche Bank.  Second, it fails to allege facts that

would give rise to any post-acquisition liability, either based on direct acts by Deutsche Bank or

indirectly through some unpleaded theory of secondary liability for the acts of MortgageIT.

Accordingly, the Court should dismiss Deutsche Bank from this action.

## A.    The Complaint Alleges No Basis for Pre-Acquisition Liability Against Deutsche Bank

The Complaint does not state a claim against Deutsche Bank merely by making the conclusory allegation that "Deutsche Bank has assumed the liabilities of MortgageIT." Compl. ¶ 17. The government alleges no facts concerning Deutsche Bank's involvement in any pre-acquisition activities of MortgageIT, nor does it allege that Deutsche Bank contractually assumed any MortgageIT obligations at the time of the acquisition. *See, e.g.*, *United States ex rel. Jajdelski v. Kaplan, Inc.*, No. 05-1054, 2010 WL 2326069, at *4 (D. Nev. June 7, 2010) (where fraud occurred prior to purchase, the defendant purchaser could not be liable). Unsupported by any facts, the allegation that Deutsche Bank assumed MortgageIT's obligations is a legal conclusion that cannot be taken as true on a motion to dismiss. *See Iqbal*, 129 S. Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

## B.    The Complaint Alleges No Basis for Post-Acquisition Liability Against Deutsche Bank

The government fares no better in justifying its inclusion of Deutsche Bank in this lawsuit based on post-acquisition conduct. The Complaint fails to allege facts regarding any direct acts by Deutsche Bank that could give rise to liability, nor does it suggest any cognizable legal theory of secondary liability.

### 1.    The Complaint Alleges No Basis for Direct Liability Against Deutsche Bank

All of the conduct alleged in the Complaint relates to MortgageIT and almost all of it occurred prior to Deutsche Bank's acquisition of MortgageIT.[6] Indeed, all of the allegations

---

[6] *See, e.g.*, Compl. ¶¶ 75-77 (2003 and 2004 HUD audits of MortgageIT); *id.* ¶ 79 (2006 communications with MortgageIT); *id.* ¶ 89 ("Until late 2005, MortgageIT had no personnel to conduct the required quality control reviews."); *id.* ¶ 94 ("No one at MortgageIT read any of the Tena findings

concerning specific loans and quality control processes for mortgage underwriting—*i.e.*, the conduct alleged to have made the Annual DEL Certifications false—are directed only against MortgageIT and do not even mention Deutsche Bank, except in section headings and topic sentences. In the specific factual allegations supporting those conclusory headings, however, Deutsche Bank is noticeably missing.[7] The mere naming of Deutsche Bank in the caption and in the section headings, with only allegations against MortgageIT alone, does not state a claim against Deutsche Bank. In short, the government fails to satisfy its burden of pleading with specificity that Deutsche Bank has knowingly caused to be presented to the government "a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1).

The only allegations in the Complaint concerning direct acts by Deutsche Bank are the alleged submission of false Annual DEL Certifications between 2007 and 2009 signed by an alleged Deutsche Bank officer stating that MortgageIT complied with the participation requirements of the DEL Program. *See* Compl. ¶ 72. As to Deutsche Bank, the Complaint specifically alleges only that an employee signed an Annual DEL Certification on February 6, 2009, which stated that MortgageIT's program complied with HUD-FHA regulations necessary to maintain its approval. *Id.* This slender reed cannot support the government's sweeping fraud claims against Deutsche Bank.

---

letters as they arrived in 2004."); *id.* ¶ 101 ("[I]n December 2004, the quality control manager attempted to implement a quality control system at MortgageIT."); *id.* ¶ 113 ("[T]he Government Loan Auditor was wholly without guidance as to any quality control plan at MortgageIT."); *id.* ¶ 122 ("MortgageIT failed to comply with its basic quality control requirements."); *id.* ¶ 127 ("MortgageIT failed to take effective action for months."); *id.* ¶ 131 ("HUD has paid more than $386 million in FHA insurance claims and related costs arising out of MortgageIT's approval of mortgages for FHA insurance."); *id.* ¶ 133 ("MortgageIT falsely certified, on a loan-by-loan basis, that it had complied with HUD rules."); *see also* *id.* ¶¶ 143-78 (describing six example loans certified by MortgageIT from 2002 to 2005).

[7] The government generically alleges, for example, that "Deutsche Bank and MortgageIT personnel failed to review all early payment defaults." *See, e.g.,* Compl. ¶ 86. In support, however, the Complaint states only that "MortgageIT quality control personnel did not know how to identify early payment defaults until February 2006," "MortgageIT nevertheless failed to review all early payment defaults," and "MortgageIT failed to identify early payment defaults to the vendors." *Id.* ¶¶ 86-87.

The 2009 Annual DEL Certification itself was submitted on behalf of MortgageIT and nowhere mentions Deutsche Bank. *See* Annual DEL Certification (Feb. 9, 2009), Park Decl. Ex. C.[8] Although at that time an indirect subsidiary of Deutsche Bank, MortgageIT remained the formal (and separate) entity authorized to participate in the DEL Program. As such, HUD regulations require that Annual DEL Certifications be "completed by the mortgagee"—*i.e.*, the DEL, in this case, MortgageIT, not Deutsche Bank—and be "signed by a senior officer (vice president or above)" of MortgageIT. HUD Handbook No. 4060.1 § 4-2. In light of this requirement, the Annual DEL Certifications cannot be attributed to Deutsche Bank.[9] To the contrary, MortgageIT is the entity listed on the certifications at issue and rightly so, because MortgageIT was the participating DEL—Deutsche Bank itself was never a DEL.

In any event, the 2009 Annual DEL Certification could not give rise to any liability because the Complaint does not contain any allegations of conduct by MortgageIT from 2009 at all. This is not surprising in light of the fact that MortgageIT announced on December 11, 2008 that it was winding down its lending activities and was accepting no new applications as of that date. *See* Park Decl. Ex. B. Moreover, the Complaint fails to plead that Mr. Swartz, much less Deutsche Bank as a company, signed an Annual DEL Certification believing it to be false.[10]

---

[8] The Complaint is deemed to include any document incorporated in it by reference and the Court may thus "take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment." *Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 566 (2d Cir. 2006) (citation omitted), *aff'd*, 552 U.S. 389, 128 S. Ct. 1147 (2008).

[9] It appears that the only basis on which the government has attributed post-acquisition Annual DEL Certifications to Deutsche Bank is the erroneous assumption that the employee who signed the certification in 2009 was a Director of Deutsche Bank. *See* Compl. ¶ 72. In fact, as noted above, *see supra* n.4, Mr. Swartz was not a director of Deutsche Bank AG. More important for purposes of this lawsuit, Mr. Swartz was explicitly delegated signing authority for MortgageIT and was an officer of MortgageIT. *See* Park Decl. Ex. D. This role is consistent with the fact that the certification itself lists MortgageIT, and not Deutsche Bank, as the DEL, and that the relevant HUD regulations require the certification of a senior officer of MortgageIT.

[10] The government does not and cannot allege that Deutsche Bank had any involvement in MortgageIT's Loan Certifications on which the government alternately bases its FCA claims. As the

In the absence of any allegations of direct participation by Deutsche Bank in the purportedly fraudulent claims process, Deutsche Bank cannot be subject to direct claims under the FCA. *See, e.g., Hockett*, 498 F. Supp. 2d at 59-60; *United States ex rel. Tillson v. Lockheed Martin Energy Sys., Inc.*, No. 00-39, 2004 WL 2403114, at *33 (W.D. Ky. Sept. 30, 2004); *see also United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 515-16 (E.D. Pa. 2010) (allegations that a parent was responsible for regulatory compliance of the subsidiary and had a taxpayer ID that appeared on the fraudulent certifications submitted by the subsidiary fail to state an FCA claim against the parent).

### 2. The Complaint Alleges No Basis for Secondary Liability Against Deutsche Bank

The Complaint also fails to plead any cognizable legal theory of indirect secondary liability against Deutsche Bank. The government does not even attempt to plead any veil-piercing or successor liability theory, or facts to support such a theory, as a basis to include Deutsche Bank as a Defendant in this lawsuit. *See, e.g., In re Pharm. Indus. Average Wholesale Price Litig.*, 538 F. Supp. 2d 367, 391 (D. Mass. 2008) (dismissing FCA claims as to a corporate parent where a relator failed to plead facts demonstrating that the parent directly submitted false claims or facts supporting veil-piercing); *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-0302, 2011 WL 1765509, at *8 (C.D. Cal. Apr. 20, 2011) (finding bare allegation of successor-in-interest liability insufficient under the doctrine of de facto merger).

---

Complaint notes, all six of the example Loan Certifications were made by MortgageIT prior to Deutsche Bank's acquisition in 2007. *See* Compl. ¶¶ 143, 149, 155, 161, 167, 173 (alleging false Loan Certifications were made in 2002, 2004, and 2005). That is why the government alleges throughout the Complaint that MortgageIT—and only MortgageIT—submitted Loan Certifications. *See, e.g.*, Compl. ¶¶ 133-35. In short, the government does not and cannot state any claim against Deutsche Bank related to MortgageIT's Loan Certifications.

The failure to plead scienter sufficient to establish secondary liability is particularly problematic for the government. This Court has held that a failure to plead facts regarding knowledge of alleged fraud is "especially glaring in the unusual context of FCA claims brought against a secondary actor . . . rather than the provider that actually submitted the allegedly false claims." *Pervez*, 736 F. Supp. 2d at 814-15. In dismissing claims against an auditor, this Court noted that it is "particularly important . . . where the allegedly culpable conduct at issue is at a somewhat greater remove, that the complaint describe adequately a plausible basis for attributing knowledge or deliberate ignorance to the party facing secondary liability." *Id.* at 815. Here, the utter absence of allegations regarding knowledge of alleged fraud against a secondary actor is "especially glaring." *Id.* at 814. In light of the Supreme Court's admonition that the FCA's provisions "must be carefully restricted," *McNinch*, 356 U.S. at 598, 78 S. Ct. at 952, the FCA claims against Deutsche Bank should be dismissed.

## III.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE FCA AGAINST DEUTSCHE BANK OR MORTGAGEIT

The FCA imposes civil liability for knowingly making "a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1) (2006).[11] The government's theory is that Defendants violated the FCA by submitting (1) Annual DEL Certifications stating that MortgageIT complied with the eligibility criteria for the DEL Program, and (2) Loan Certifications stating that MortgageIT had conducted the requisite due diligence for each loan it endorsed. Neither of these theories states an FCA claim, nor does the government's unsupported "reverse false claim" state a cause of action.

---

[11]   Although sections 3729(a)(1), (a)(3), and (a)(7) were amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617 (2009), those amendments were prospective only. The prior provisions govern the claims in this case that predate FERA. *See, e.g.*, *Pervez*, 736 F. Supp. 2d at 811 n.36.

### A.   The Complaint Fails To State a Claim Based on MortgageIT's Annual DEL Certifications

The Annual DEL Certifications were conditions of MortgageIT's participation in the DEL Program; they were not claims for payment, which the FCA defines as a "request or demand . . . for money or property." *Id.* § 3729(c). Moreover, the Complaint fails to allege that the Annual DEL Certifications were material to any decision by HUD to insure any loan, that they were knowingly false, or that they caused the government to incur any losses.

### 1.   MortgageIT's Annual DEL Certifications Were Conditions of Participation, Not Claims for Payment

The Second Circuit has held that a certification giving rise to FCA liability must be a condition for payment, not simply a certification of compliance as a condition of participation in a federal program in which payments are made by the government. *See Mikes v. Strauss*, 274 F.3d 687, 697 (2d Cir. 2001) ("[A] claim under the [FCA] is legally false only where a party certifies compliance with a statute or regulation as a condition to governmental payment."). Other Courts of Appeals have noted this key distinction as well. *See, e.g., United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1220 (10th Cir. 2008) ("Where a contractor participates in a certain government program in order to perform the services for which payments are eventually made . . . courts are careful to distinguish between conditions of program participation and conditions of payment."); *United States ex rel. Gross v. AIDS Research Alliance-Chi.*, 415 F.3d 601, 604 (7th Cir. 2005) ("An FCA claim premised upon an alleged false certification of compliance with statutory or regulatory requirements . . . requires that the certification of compliance be a condition of or prerequisite to government payment.").

This distinction is critical because it prevents the government from using a generalized statement of eligibility to participate in a federal program as a weapon to enforce any compliance failures in connection with such a program. *See Mikes*, 274 F.3d at 699 ("[T]he False Claims

Act was not designed for use as a blunt instrument to enforce compliance with all medical regulations—but rather only those regulations that are a precondition to payment—and to construe the impliedly false certification theory in an expansive fashion would improperly broaden the Act's reach."). Transforming a certification of compliance into a condition of payment would thus undermine the finality of actions taken by participants in federal programs.

To distinguish conditions of participation from conditions of payment, courts look to whether the "[c]onditions of participation, as well as a provider's certification that it has complied with those conditions, are enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program." *Conner*, 543 F.3d at 1220; *Mikes*, 274 F.3d at 701-02. In contrast, conditions of "payment are those which, if the government knew they were not being followed, might cause it to actually refuse payment." *Conner*, 543 F.3d at 1220.

The Annual DEL Certifications at issue contain only a single, broad statement of compliance with program participation requirements—specifically, once per year, an individual certified that "to the best of my knowledge," MortgageIT "conform[ed] to all HUD-FHA regulations necessary to maintain its HUD-FHA approval." Compl. ¶ 54. Thus, the language of the Annual DEL Certifications is clear that they were conditions of continued participation in the DEL Program, and the government admits as much in the Complaint. *See id.* ¶ 53 ("To obtain and maintain [DEL] status, a [DEL] must submit an annual certification to HUD.").[12]

---

[12] The Complaint is also devoid of allegations that the government relied upon the Annual DEL Certifications—as opposed to the Loan Certifications—in deciding whether to endorse any specific loans certified by MortgageIT. *See, e.g.*, Compl. ¶ 23 (explaining that the FHA endorses loans based on the DEL's Loan Certification stating that the mortgage qualifies for FHA insurance, as opposed to its Annual DEL Certification). Indeed, the government conspicuously limits its "prerequisite of payment" allegations to the Loan Certifications provided by MortgageIT. *See, e.g., id.* ¶ 133 ("If HUD had known that MortgageIT's mortgage eligibility certifications were false, HUD would not have permitted

Moreover, the telltale feature of a condition of participation—the availability of

administrative remedies—leaves no doubt that an Annual DEL Certification is not a condition of

payment. Under HUD regulations, the remedy for a DEL's failure to meet program requirements

would include probation, disqualification, or civil money penalties assessed by the MRB, but not

denial of insurance benefits. *See, e.g.*, 24 C.F.R. §§ 25.2(b), 203.3(d)(1). Notably, HUD

regulations clearly contemplate that loans previously endorsed by a designated DEL may be

insured even if the lender violates program requirements. *Id.*

The existence of a complex monitoring and remedial scheme within HUD to pursue

lenders whose Annual DEL Certifications are false, whether or not such remedies were pursued

against MortgageIT (they were not), precludes the assertion of an FCA claim based upon

allegedly false Annual DEL Certifications. As the Eighth Circuit stated in *United States ex rel.*

*Vigil v. Nelnet, Inc.*, 639 F.3d 791 (8th Cir. 2011):

> [The relator] must plead and prove that Nelnet's allegedly false Certifications
> were conditions of payment . . . . By contrast, if the regulatory violations were
> only conditions of FFELP participation, they "are enforced through administrative
> mechanisms, and the ultimate sanction for violation of such conditions is removal
> from the government program."

*Id.* at 799 (quoting *Connor*, 543 F.3d at 1220). Similarly, the relevant regulations contemplate

that HUD will insure mortgages even if a DEL's annual certification verifying its compliance

with those regulations is false. Compliance with quality control requirements, and certification

of that compliance as part of "all HUD-FHA regulations necessary to maintain" DEL status, are

thus not claims for payment, but conditions of continued participation in the DEL Program that

are "enforced through administrative mechanisms" with the "ultimate sanction" being "removal

from the government program." *Connor*, 543 F.3d at 1220.

---

MortgageIT to endorse those loans for FHA insurance."). Also, only the Loan Certifications are cited as
being material to the six examples in the Complaint. *See id.* ¶¶ 146, 152, 158, 164, 170, 176.

Finally, policy considerations support this result.  Based on eleven general certifications of eligibility to participate as a DEL, the government seeks to revisit decisions to insure thousands of individual loans endorsed by MortgageIT over the course of a decade.  As a result, any violation of HUD regulations by a DEL—regardless of the nature of the violation or regulation—could turn Annual DEL Certifications into false statements for FCA purposes.  Such an approach is untenable and would undermine the finality of any actions taken by participants in federal programs whenever they complete a generic form certifying eligibility to participate in the programs.

2.       MortgageIT's Annual DEL Certifications Were Not
         Material to Any Payment Decisions by the Government

The government also fails adequately to plead that any false representations in MortgageIT's Annual DEL Certifications were material to any payment decisions by the government.  Noticeably, the government does not allege that it took those certifications into account in deciding whether to insure any mortgage endorsed by MortgageIT.

*First*, the Supreme Court has held that the FCA requires that the false statement be "material to the Government's decision to pay or approve the false claim." *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 665, 672, 128 S. Ct. 2123, 2126, 2130-31 (2008) (there must be a "direct link," not an "attenuated" one, between a false statement "and the Government's decision to pay or approve a false claim").  Consequently, the FCA "does not encompass those instances of regulatory non-compliance that are irrelevant to the government's disbursement decisions." *Mikes*, 274 F.3d at 697.  Rather, the government must show that the alleged false statements were a prerequisite for payment in order to establish materiality. *See, e.g.*, *Vigil*, 639 F.3d at 799; *United States ex rel. Costner v. United States*, 317 F.3d 883, 887-88 (8th Cir. 2003); *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 680 (5th Cir. 2003)

22

(Jones, J. concurring).[13]  Here, because the Annual DEL Certifications merely verified continued compliance with DEL Program requirements and were not conditions of payment for any loans, they were not material.

 **Second**, any claim that the Annual DEL Certifications are material is undermined by the fact that the government was aware of the circumstances surrounding the statements at issue and yet continued for years to insure mortgages endorsed by MortgageIT.  If the Annual DEL Certifications had been material to the decision to insure mortgages, then HUD would have suspended or otherwise regulated MortgageIT upon learning of quality control issues.  *See, e.g., United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1019 (7th Cir. 1999) (even if defendant's statement was a lie, it was immaterial because the government agency in no way relied on the statements).

 For example, the Complaint alleges that "a HUD audit conducted during the week of September 13, 2003 . . . revealed that MortgageIT had 'not maintained a Quality Control Plan (QC) plan in accordance with HUD/FHA requirements,'" and that a September 2004 HUD audit revealed that MortgageIT had failed to fulfill the requirement to review EPDs.  *See* Compl. ¶¶ 75-79.  The Complaint also alleges that a subsequent February 2006 HUD audit revealed that MortgageIT was still failing properly to review EPDs, despite an intervening representation to the contrary.[14]  *See id.* ¶ 79.  On neither occasion did the government take any action suggesting

---

 [13]  A more lenient "tendency to influence" standard for materiality was adopted into the FCA as part of the FERA amendments in 2009, *see* 31 U.S.C. § 3729(c)(4), but as noted above, *see supra* n.11, this amendment is not retroactive and is thus applicable only to conduct that occurred after June 7, 2008, so it should have no material effect on this lawsuit.  In any event, the government still fails to plead materiality under the "tendency to influence" standard because it fails to allege any reliance on MortgageIT's Annual DEL Certifications.

 [14]  To the extent that the Complaint points to alleged misrepresentations by MortgageIT about its efforts to improve its quality control procedures, this does not change the fact that HUD continued to insure MortgageIT loans in the interim periods between multiple reviews.  *See* Compl. ¶¶ 78-80.

that it viewed MortgageIT's compliance deficiencies to be material to its decision to insure new mortgages. Instead, HUD admittedly continued to insure loans referred by MortgageIT despite the allegedly false statements in its DEL Certifications. The government may not now claim years later with the benefit of hindsight that the certifications were in fact material. *Cf. Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 165 (2d Cir. 2000) ("The determination of materiality is to be made upon all the facts as of the time of the transaction and not upon a 20-20 hindsight view long after the event."). In addition, HUD's rules and regulations provide disciplinary procedures to remedy regulatory violations, including the submission of false information to HUD in connection with FHA-insured mortgages. *See* 24 C.F.R. §§ 25.2, 25.5, 25.6(k), 203.3; 12 U.S.C. § 1708(c)(1). Against this backdrop, the allegation that the content of MortgageIT's Annual DEL Certifications was material to the claims process is simply implausible.

        3.    <u>MortgageIT's Annual DEL Certifications Were Not Knowingly False</u>

The FCA requires false or fraudulent claims for payment that are made "knowingly." 31 U.S.C. § 3729(a)(1). A defendant acts "knowingly" when he "has actual knowledge of the information; acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b). Thus, to survive a motion to dismiss, the Complaint must sufficiently allege "that the claim and/or statement at issue was false" and that the person certifying the statement and/or claim had "knowledge" of the falsity. *Pervez*, 736 F. Supp. 2d at 814; *see also United States ex rel. Colucci v. Beth Israel Med. Ctr.*, No. 06-5033, 2011 WL 1226267, at *12 (S.D.N.Y. Mar. 31, 2011) ("[T]he FCA is intended to punish only 'wrongdoing,' not honest mistakes.").

Where, as here, the statement at issue is made only "to the best of my knowledge," the requisite level of scienter is elevated to actual knowledge because without such knowledge the statement cannot be false. *See United States v. Ekelman & Assocs., Inc.*, 532 F.2d 545, 549 (6th

Cir. 1976) (a certification cannot be actionable as "reckless" under the FCA unless it is "an unqualified assertion of fact."). The Complaint does not sufficiently allege that MortgageIT's Annual DEL Certifications were made with reckless disregard for their truth, much less the higher standard of actual knowledge applicable here.

The government purports to base its allegations regarding the Annual DEL Certifications on eleven such certifications from 1999 to 2009, which it alleges were filed by MortgageIT and later by Deutsche Bank. *See* Compl. ¶ 70.[15]  In actuality, the Complaint identifies only two such certifications:  (1) Gary Bierfriend, the President of MortgageIT, signed an Annual DEL Certification on February 1, 2006; and (2) Joseph Swartz, a Deutsche Bank Director, signed an Annual DEL Certification on February 6, 2009. *See id.* ¶¶ 71, 72.  As for the other nine, the Complaint conclusorily asserts that unnamed MortgageIT and Deutsche Bank officers "filed similar certifications each year." *Id.*  Plainly, allegations based on these nine Annual DEL Certifications for which no signatory is identified fail at the outset to plead a fraud claim.

As to the two Annual DEL Certifications for which the signatories are identified, the Complaint does not allege that the signatories—Mr. Bierfriend and Mr. Swartz (or anyone else for that matter)—had knowledge of contrary facts.  Thus, the Complaint at most suggests only that the signatories of the Annual DEL Certifications unknowingly passed information received from others to HUD that turned out to be false. *See Ekelman & Assocs.*, 532 F.2d at 549 (a "certification of truth 'to the best of my knowledge and belief' is a qualified assertion of facts represented"); *United States ex rel. Loughren v. Unum Group*, 613 F.3d 300, 310 (1st Cir. 2010) (statements of opinion may form the basis of FCA liability only "where the speaker knows facts

---

[15]  As the actual certifications demonstrate, the Complaint erroneously asserts that Deutsche Bank submitted the certifications in 2007 through 2009. *See supra* at 15-16.

which would preclude such an opinion") (internal quotation omitted).[16]  The government's allegations thus are not sufficient to state an FCA claim.

Moreover, even if "actual knowledge" were not the standard here, the Complaint alleges at most that the signatories of the Annual DEL Certifications "must have known" about the alleged false claims.  Such an allegation, however, would create only a "mere possibility" that the signatories acted knowingly, which still is insufficient to give rise to an inference of scienter under the FCA.  *Colucci*, 2011 WL 1226267, at *12; *see also Pervez*, 736 F. Supp. 2d at 814 (holding that the court need not accept a conclusory theory that an auditor "must have intentionally assisted [the claimant] in its fraudulent concealment or it must not have done the audits as claimed because if it had done the audits it necessarily would have detected the falsity of the [claims]"); *cf. Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 827 (8th Cir. 2003) ("Without allegations of particular facts demonstrating how the defendants knew of the scheme at the time they made their statements of compliance . . . or that they were aware of a GAAP violation and disregarded it, a showing in hindsight that the statements were false does not demonstrate fraudulent intent.").[17]  Of course, the Complaint is totally defective on this issue as

---

[16]  Nor does the Complaint allege that any individual had constructive knowledge of falsity, as specified by the FCA.  Acts amounting to negligence or innocent mistake are insufficient to show that a defendant acted "knowingly."  *See Mikes*, 274 F.3d at 703 ("[T]he 'requisite intent is the knowing presentation of what is known to be false' as opposed to negligence or innocent mistake.") (quoting *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1478 (9th Cir. 1996)).  Here, the Complaint alleges negligence and gross negligence only generally against Defendants, but it does not allege that any individual acted with deliberate ignorance or reckless disregard of the truth or falsity of the information in the Annual DEL Certifications.

[17]  For example, the Complaint alleges that letters regarding suspected underwriting violations—letters that were prepared by an outside vendor, Tena Companies, Inc., which MortgageIT retained in 2004 following its dialogue with HUD about reviewing early payment defaults—were allegedly "stuffed . . . , unopened and unread, in a closet in MortgageIT's Manhattan headquarters."  Compl. ¶ 95.  But this paragraph cannot suffice to allege that anyone at MortgageIT who submitted a Loan Certification acted with deliberate ignorance or reckless disregard of the truth.  Moreover, the Complaint ignores the equally plausible explanation that those letters were unopened for a period of time because they were circulated electronically as well as in hard copy.

to Deutsche Bank, given the lack of any scienter allegations whatsoever—even conclusory ones—directed at Deutsche Bank.

Finally, there can be no scienter where the government's interactions with MortgageIT for years show that despite awareness of the alleged acts it now claims were fraudulent HUD continued to insure loans processed by MortgageIT. Government knowledge "helps distinguish, in FCA cases, between the submission of a false claim and the *knowing* submission of a false claim—that is, between the presence and absence of scienter." *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 951 (10th Cir. 2008) (emphasis in original). Accordingly, courts routinely have held that there is no scienter where the government has made payments (or in this case insured loans) with contemporaneous knowledge regarding the allegedly false nature of defendants' statements.[18]

Here, the Complaint contends that the Annual DEL Certifications were "false" "regarding purported compliance with HUD quality control requirements." Compl. ¶ 130. It is apparent from the face of the Complaint, however, that HUD possessed knowledge of precisely this alleged "falsity" at least since 2003, and communicated with MortgageIT regarding these issues. *See id.* ¶¶ 10, 74-79, 127. Specifically, the Complaint alleges that HUD audits in 2003, 2004, and 2006 again identified issues with MortgageIT's regulatory compliance. *Id.* ¶¶ 75-79. Thus, HUD for years was aware of the practices underlying MortgageIT's Annual DEL Certifications. Nonetheless, it determined not to pursue any significant administrative remedies against

---

[18] *See, e.g., United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002) (the government's knowledge of the material facts underlying representations implicit in defendant's conduct negated scienter as a matter of law); *United States ex rel. J. Cooper & Assocs. v. Bernard Hodes Group, Inc.*, 422 F. Supp. 2d 225, 239 (D.D.C. 2006) (FCA "claim is frivolous and vexatious if the government's awareness of the circumstances constituting the alleged transgression makes any legal claim of fraud untenable"); *United States ex rel. Mikes v. Straus*, 98 F. Supp. 2d 517, 527 (S.D.N.Y. 2000) ("[T]he government's undisputed prior knowledge of information alleged to constitute fraud defeated any inference of a false claim.").

MortgageIT.  In particular, it did not suspend or remove MortgageIT or its employees from the

DEL Program, but instead permitted MortgageIT to continue participating in the DEL Program.

The only reasonable conclusion from this informed inaction by HUD is that it did not, in real-

time, consider MortgageIT's compliance issues to be material to the decision to insure loans.

There can be no scienter where the government's inaction for years indicated that the alleged

acts it now claims were fraudulent were not material and that it was not misled.  In these

circumstances, the government cannot plausibly claim that MortgageIT acted knowingly to

mislead HUD.

### 4.    MortgageIT's Annual DEL Certifications Did Not Cause Any Losses Incurred by the Government

The Complaint fails to plead that the Annual DEL Certifications caused the government's

alleged losses.  It is not sufficient for causation purposes merely to allege transaction causation—

that "but for" these statements, the government would not have insured subsequent mortgages.

*See United States v. Hibbs*, 568 F.2d 347, 349 (3d Cir. 1977).  Rather, the FCA requires loss

causation—a "causal connection must be shown between loss and fraudulent conduct." *Id.*

(concluding that changing economic circumstances, and not false certifications, caused the

government's losses); *see United States v. Rapoport*, 514 F. Supp. 519, 525 (S.D.N.Y. 1981).[19]

The government has failed adequately to plead either form of causation.  As described

above, the Complaint contains no allegations that HUD ever relied on MortgageIT's Annual

DEL Certifications in deciding to insure specific loans, while at the same time it admits that the

---

[19]  Although some other courts have applied a "but for" standard, *see, e.g., United States v. First Nat'l Bank of Cicero*, 957 F.2d 1362, 1374 (7th Cir. 1992), Defendants respectfully submit that such a loose approach to causation is inconsistent with recent Supreme Court decisions interpreting federal anti-fraud statutes. *See, e.g., Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461, 126 S. Ct. 1991, 1998 (2006) (under RICO, "the central question [a court] must ask is whether the alleged violation led directly to the plaintiff's injuries"); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342, 125 S. Ct. 1627, 1631 (2005) (requiring a showing of "loss causation" for securities fraud).

government was long aware of the alleged false statements in those certifications. Thus, it appears that, regardless of whether MortgageIT was in perfect compliance with the eligibility requirements for the DEL Program, the government still would have insured the individual mortgages MortgageIT endorsed and would still have suffered the losses it now blames on MortgageIT.[20] *See Mikes*, 274 F.3d at 697 ("it would be anomalous to find liability when the alleged noncompliance would not have influenced the government's decision to pay"); *cf. United States ex rel. Butler v. Hughes Helicopter Co.*, No. 89-5760, 1993 WL 841192, at *9 (C.D. Cal. Aug. 25, 1993) (causation undermined by government knowledge that a claim was based on false information). In fact, the Complaint alleges that only MortgageIT's Loan Certifications—not its Annual DEL Certifications—"bore upon the likelihood that borrowers would make mortgage payments." Compl. ¶ 180. This vague assertion falls far short of a causal connection.

Indeed, the lengthy chain of events between a purportedly false Annual DEL Certification and the actual payment of federal money is far too indirect and attenuated to form a basis for FCA liability. First, MortgageIT submitted an Annual DEL Certification to maintain its status as a DEL; then, a borrower applied for an FHA-approved loan and a designated underwriter certified that borrower's loan application; then, for whatever reason, that borrower defaulted on his mortgage; next, the third-party institution that had purchased the mortgage from MortgageIT submitted an insurance claim for the defaulted mortgage; and finally, the government paid the claim. The government's strained theory in this case would transform a tenuously related DEL Certification into a subsequent "claim for payment" many steps and potentially many years later. The statutory text and FCA case law cannot bear such a reading.

---

[20] In contrast, in *United States v. Eghbal*, 548 F.3d 1281 (9th Cir. 2008), the defendants admitted that HUD would not have insured mortgages that they had referred if it had known that the statements at issue were false. *Id.* at 1285. Just the opposite is true here, where the government knew of the alleged deficiencies in the certifications and yet continued to insure the mortgages MortgageIT endorsed.

Moreover, the Complaint fails to plead that the government would not have incurred the hundreds of millions of dollars in losses that it did had the Annual DEL Certifications not purportedly been false. Nor would such an allegation be plausible.

The Complaint alleges that the Annual DEL Certifications are false due to MortgageIT's inadequate quality control procedures, but the only allegations of such inadequacies mentioned in the Complaint concern the alleged failure to conduct adequate EPD reviews. As an initial matter, EPD reviews by definition are conducted after a loan is insured and defaults. Although the government might hypothesize that EPD reviews have a tendency to increase the quality of future loans submitted for insurance, there is no direct causal link between the failure to conduct an EPD review and a government loss on any specific future loan that defaults.[21]

Even if the government could draw such a connection between allegedly inadequate EPD reviews and any particular loan default, which it has not seriously attempted to do, there are a myriad of intervening causes for the government suffering a loss on an FHA-insured loan. Homeowners may default on mortgages for a wide variety of reasons that have nothing to do with the underwriting process. Borrowers die, lose their jobs, suffer pay cuts, fall ill, get divorced, and sometimes choose to default, particularly when their property values decline more than the 3.5% equity they invested. While unfortunate, none of these things is surprising when the goals and structure of the FHA program are combined with the largest economic downturn since the Great Depression. The government cannot simply lay the blame for hundreds of millions of dollars in losses on MortgageIT's purported failure to conduct after-the-fact reviews

---

[21] The Complaint describes only one situation involving one underwriter in Michigan in which it speculates that had MortgageIT conducted more rigorous EPD reviews "it would have recognized these problems by 2004, terminated the underwriter and MortgageIT's relationship with the brokers, and reported the problems to HUD." *Id.* ¶ 123. The Complaint does not and cannot make any non-speculative allegations that better EPD reviews would have identified the issue sooner and avoided some of the government's losses, let alone make any attempt to identify the allegedly fraudulent loans by that underwriter that resulted in government losses that would have been avoided.

of loans that defaulted early.[22]  For all of these reasons, the claims based on the allegedly false

Annual DEL Certifications should be dismissed.

> **B.    The Complaint Fails Adequately To Plead a Claim Under Rule 9(b)
> Based on MortgageIT's Loan Certifications**

The government's fall-back to the Annual DEL Certification theory is that MortgageIT's

individual Loan Certifications also support the FCA claims.  Aside from six specific mortgages,

however, the government does not even attempt to identify the allegedly fraudulent loans or false

Loan Certifications, much less explain why they purportedly were fraudulent.  Moreover, even

with respect to the six Loan Certifications identified in the Complaint, the government fails to

plead the identity of the individual who made the allegedly false statement or a basis for inferring

that this unidentified person "knowingly" made a false statement.  And, yet again, the Complaint

provides absolutely no basis for a claim against Deutsche Bank.

> 1.    The Complaint Pleads No Facts with Respect to
> All But Six of the 39,000 Loan Certifications at Issue

The Complaint's three FCA counts fail to identify the allegedly false or fraudulent

statements on which they are based.  Instead, in a textbook example of improper "shotgun"

pleading, each count incorporates more than 180 preceding paragraphs and then simply alleges

that "as set forth above," both Deutsche Bank and MortgageIT are liable under the FCA.  *See*

Compl. ¶¶ 185, 190, 195.  As a result, it is entirely unclear what specific alleged conduct is the

basis for the government's FCA claims against either Deutsche Bank or MortgageIT.  For that

reason alone, the government's FCA claims should be dismissed.

The government's claims based on MortgageIT's purportedly false Loan Certifications

appear to be based on the following allegations: (1) MortgageIT certified that it conducted due

---

[22]  This is particularly true in light of the fact that HUD had administrative remedies at its
disposal to address the purported EPD issues.  An FCA claim is not the proper remedy for the alleged
compliance deficiencies.

diligence on "more than 39,000 loans" that were endorsed for FHA insurance, *see id.* ¶ 134; (2) "thousands" of unspecified loans have led to insurance claims; (3) the government expects thousands more unspecified loans to result in claims at some unidentified point in the future, *see id.* ¶¶ 179, 182; and (4) "many" (but not all) of these existing and future claims are allegedly based on Loan Certifications that are purportedly false for unknown reasons, *see id.* ¶¶ 181-82.

The Complaint, however, makes no attempt to identify which of MortgageIT's thousands of Loan Certifications were allegedly false or why. Instead, it rests entirely on six supposed examples of fraudulent certifications out of 39,000 loans and the unsubstantiated allegation that these examples establish a "nationwide pattern of failing to conduct due diligence." *Id.* ¶ 136. The government may not simply extrapolate such a conclusion based solely on six examples. *See Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 470 (7th Cir. 1999) ("[Y]ou cannot get around the requirements of [Rule 9(b)] just by joining a lot of separate cases into one."); *cf. Wal-Mart Stores, Inc. v. Dukes*, No. 10-277, 2011 WL 2437013, at *15 (U.S. June 20, 2011) (holding that 120 affidavits reporting instances of gender discrimination did not establish a nationwide policy of employment discrimination). Rather, the government must plead all of the elements of an FCA claim with respect to ***each*** purportedly actionable Loan Certification. To do that, the government must, at a minimum, identify the loans and the allegedly false certifications and explain why the certifications were fraudulent. *See United States ex rel. Lindsey v. Easter Seals UCP N.C., Inc.*, No. 06-125, 2007 WL 3124664, at *5 (W.D.N.C. Oct. 25, 2007) ("At some point in this case, someone is simply going to have to sit down and review each and every bill to determine what, if any, wrongdoing is evident in each claim or billing. In the first instance, that duty falls to plaintiffs to make such determination, and crystallize that thought in the form of an allegation that meets the standard of Rule 9(b).").

Aside from the six allegedly false Loan Certifications specifically identified in the Complaint, however, the government's conclusory allegations utterly fail to identify which of MortgageIT's thousands of certifications it believes were false, much less explain with the particularity required by Rule 9(b) why those certifications were false. For example, in *United States ex rel. Cox v. Iowa Health Sys.*, 29 F. Supp. 2d 1022 (S.D. Iowa 1998), the FCA claim listed a few examples of allegedly fraudulent bills. The allegations, however, were insufficient under Rule 9(b) because "this alleged practice . . . was not consistently performed on all bills submitted by defendants," and thus the "relator must plead with particularity the specific fraudulent claims submitted." *Id.* at 1025. Similarly, in *United States ex rel. Vallejo v. Investronica, Inc.*, 2 F. Supp. 2d 330 (W.D.N.Y. 1998), the district court dismissed an FCA case alleging a long-running scheme to defraud the U.S. Customs Service except as to the two specific examples actually provided. The Court held that these allegations were insufficient under Rule 9(b) with respect to any allegedly false claim other than the two specifically identified incidents because the plaintiff had "fail[ed] to plead exactly where and when those statements were made." *Id.* at 337. And in *United States v. Crescent City, E.M.S., Inc.*, 151 F.R.D. 288, 290 (E.D. La. 1993), the government's complaint "list[ed] 501 claims that were paid on behalf of eighteen named Medicare patients within a six-month period, and the total dollar amount of claims paid on behalf of each patient." The complaint, however, still failed under Rule 9(b) because "the government fail[ed] to allege the exact dates the alleged false claims were made, the identity of the person making the representation, or the place where the alleged fraud took place," and "it would be improper to require the defendants to pore over their records to determine this information so that they may respond, particularly if, as defendant alleges, plaintiff has this information within its possession." *Id.*

The Complaint in this case is even more conclusory than the defectively pleaded complaints in *Cox*, *Investronica*, and *Crescent City*. As the allegations regarding the six Loan Certifications make clear, the government should have the information it needs to identify precisely which loans it believes MortgageIT falsely certified. But the Complaint makes no effort to list the allegedly false certifications. Thus, the government has failed even to "specify the statements that [it] contends were fraudulent," much less "identify the speaker" for each allegedly false statement and "state where and when the statements were made." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). Likewise, the government has not even suggested, much less pleaded, any facts suggesting "why" any certifications other than the six specifically mentioned even could be false. *Id.*

The boilerplate allegation of a "nationwide pattern" does not help explain why the government believes the Loan Certifications were false. To begin with, the government essentially concedes that it is not relying on any written policy directing employees not to conduct due diligence; instead, it appears to be challenging the alleged failure of individuals to conduct adequate due diligence in six specific instances. Even assuming that these isolated allegations could establish an intentional false statement as to the six loans, which they do not, they certainly provide no basis for inferring that similar errors occurred with respect to the thousands of other loans certified by MortgageIT at different times, by different people, in different locales. *See, e.g.*, *Wal-Mart Stores*, 2011 WL 2437013, at *9 (explaining that, where decisions are made independently by individual managers, "demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's"); *SEC v. Morgan Keegan & Co.*, No. 09-1965, 2011 WL 2559362, at *10 (N.D. Ga. June 28, 2011) (rejecting the government's attempt "to infer that the communication to four individual investors

34

by four brokers is sufficient to create an issue of fact whether *all* Morgan Keegan brokers made misrepresentations to their ARS customers") (emphasis added).[23]

Individually and collectively, these failures to plead with particularity leave no doubt that the government has failed to satisfy Rule 9(b). That failure goes to the very heart of the policies underlying Rule 9(b), because it deprives MortgageIT of *any* notice, much less "fair notice" of the claims that the government is asserting against it. *See O'Brien*, 936 F.2d at 676. Moreover, if allowed to proceed, the government's conclusory pleading strategy would appear to allow it to conduct the very type of fishing expedition—potentially into every Loan Certification MortgageIT ever made—that Rule 9(b) was intended to prevent. *See, e.g.*, *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 116 (2d Cir. 1982) ("Rule 9(b) [fails] in its purpose if conclusory generalizations such as these will permit a plaintiff to set off on a long and expensive discovery process in the hope of uncovering some sort of wrongdoing.").

### 2. The Complaint Fails Adequately To Plead Any Claim with Respect to the Six Loan Certifications Mentioned in the Complaint

The government has also failed to satisfy Rule 9(b) with respect to the six Loan Certifications actually mentioned in the Complaint. To begin with, the Complaint includes the generic allegation that "MortgageIT" made the allegedly false Loan Certifications. *See, e.g.*, Compl. ¶¶ 133-35. But Rule 9(b) requires the government to identify the specific individual who

---

[23] Moreover, the government is not even relying on one specific type of alleged due diligence failure. Instead, even with respect to the six specific examples mentioned in the Complaint, the government relies on six *unique and different alleged due diligence failures*. Specifically, the complaint alleges the following flaws with respect to the six examples: (1) "New York Example"—an alleged failure adequately to document "gift funds" received by the borrower, Compl. ¶ 145; (2) "Colorado Example"—an alleged failure to develop a credit history for the borrower, *id.* ¶ 151; (3) "Indiana Example"—an alleged failure to document the borrower's cash investment in the property, *id.* ¶ 157; (4) "Michigan Example"—an alleged failure to verify a borrower's current employment, *id.* ¶ 163; (5) "Oklahoma Example"—an alleged failure to verify an "excessive" earnest money deposit, *id.* ¶ 169; and (6) "Texas Example"—an alleged failure to reconcile conflicting employment records, *id.* ¶ 175. These allegations show that detailed pleading about each allegedly false certification—rather than conclusory statements about purported "nationwide patterns"—is essential to define and limit the scope of this case.

made the allegedly false certification and cannot rely on a vague allegation directed at the company as a whole.

In addition, the government has not attempted to allege that the unnamed underwriters made any false Loan Certifications "knowingly." To the contrary, the haphazard and disparate nature of the alleged technical deficiencies in a handful of government-selected mortgages strongly suggests isolated sloppiness at best, not intentional falsification. *Cf. Lamers*, 168 F.3d at 1020 (declining "to infer, based on a handful of technical violations committed by individual drivers in a complex new busing program, that [defendant's] management consciously orchestrated a campaign to deceive the [government]"); *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265-67 (9th Cir. 1996) (not all minor regulatory violations give rise to an FCA claim). Moreover, nowhere does the Complaint connect allegations of false statements with allegations of an individual's actual knowledge, deliberate ignorance, or reckless disregard of the truth. It alleges a variety of compliance failures by MortgageIT, but it does not allege scienter by any individual, much less one who certified a loan to HUD.

These pleading failures doom the government's FCA claims with respect to the six examples. Even if Rule 9(b) somehow permitted the government to allege thousands of cloned claims based on a purported nationwide pattern exemplified by these six loans, which it does not, those claims would suffer from the same fundamental defects that doom the six prototypes.[24]

## C.     Count III Fails To State a Reverse False Claim

The FCA's reverse false claim provision imposes liability for knowingly using a false statement to "to conceal, avoid, or decrease an obligation to pay or transmit money or property to

---

[24] *See, e.g., United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1315 (11th Cir. 2002), *cert. denied*, 537 U.S. 1105, 123 S. Ct. 870 (2003) ("Because we find that Clausen failed to meet the minimum pleading requirements for the actual presentment of any false claims even as to the specific examples . . . for which Clausen provided patient identities, dates of testing and testing procedures, it is beyond question that his allegations with even less specifically pleaded information must also fail.").

the Government." 31 U.S.C. § 3729(a)(7).  This provision is limited to situations in which a defendant had a clear legal obligation *to pay* to the government an ascertainable amount of money.  The "obligation to pay" the government must be established at the time the alleged false statement was made and must be "a specific, legal obligation . . . in the nature of those that [give] rise to actions of debt at common law for money or things owed." *Vigil*, 639 F.3d at 801 (quoting *United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 773 (8th Cir. 1997) ("The obligation cannot be merely a potential liability: instead, in order to be subject to the penalties of the False Claims Act, a defendant must have a present duty to pay money or property.")).

The Complaint pleads no facts even suggesting that Defendants ever owed a debt to the government or that they wrongfully retained any overpayment from the government. Accordingly, this claim must be dismissed.  *See, e.g., Wood ex rel. United States v. Applied Research Assocs., Inc.*, 328 Fed. App'x 744, 748 (2d Cir. 2009), *cert. denied*, 130 S. Ct. 128 (2010); *Haas v. Gutierrez*, No. 07-3623, 2008 WL 2566634, at *5 (S.D.N.Y. June 26, 2008).

## IV.  MANY OF THE CLAIMS ON WHICH THE COMPLAINT IS BASED ARE TIME-BARRED

### A.  FCA Counts Based on Claims Before November 15, 2004 Are Time-Barred

The FCA states that a claim may not be brought "more than 6 years after *the date on which the violation of [the FCA] is committed*." 31 U.S.C. § 3731(b)(1) (emphasis added). Notwithstanding this clear limitation, the Complaint purports to encompass all defaults on mortgages endorsed by MortgageIT dating as far back as 1999, in effect doubling the period at issue. *See* Compl. ¶¶ 7, 71. The FCA's six-year limitations period, however, bars any claims pre-dating November 15, 2004.[25]

---

[25]  The FCA also provides a 3-year discovery rule with a 10-year cutoff, but there is no question that this lawsuit is governed by the 6-year limitations period. *See* 31 U.S.C. § 3731(b). The government would be entitled to the 10-year period only if it had learned of the material facts after November 15,

The government's theory is that Annual DEL and Loan Certifications—not the actual claims for payment submitted later by third parties—are the alleged false claims. *See id.* ¶¶ 10-11. Indeed, the government asserts claims based on payments it has made and continues to make even after knowing of the alleged false certifications. Thus, the date of an alleged violation is the date a certification was submitted, and that date should start the limitations period.

In dicta, the Second Circuit has stated that the limitations period for an FCA claim "begins to run on the date that the claim is made, or, if the claim is paid, on the date of payment." *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1157 (2d Cir. 1993) (citing *Blusal Meats, Inc. v. United States*, 638 F. Supp. 824, 829 (S.D.N.Y. 1986), *aff'd,* 817 F.2d 1007 (2d Cir. 1987)). The opinion in *Kreindler*, however, did not analyze or decide this limitations question. *See* 985 F.2d at 1156 (before turning to the dispositive issue, the court noted its "disagreement" with parts of the lower court's statute of limitations discussion so that they would not be viewed as "precedential"). Analysis of the issue rests on the statutory language, which clearly states that the limitations period starts on the date of the alleged FCA violation, not the date of payment. Because the Complaint advances a theory that treats MortgageIT's certifications as alleged FCA violations, this Court should hold that any claims are time-barred if the applicable Loan Certification was submitted by MortgageIT to HUD before November 15, 2004. At a minimum, claims should be barred if based on mortgages for which an insurance claim was made before November 15, 2004.

---

2007. (MortgageIT entered into tolling agreements with the government stating that it would not raise any statute of limitations defense, except to the extent that such a defense was available on November 15, 2010.) But the Complaint makes clear that the government had notice of the alleged FCA violations long before that date. *See, e.g.,* Compl. ¶¶ 74-79 (HUD was on notice of the alleged quality control violations relating to the Annual DEL Certifications as early as 2003); *id.* ¶ 127 (HUD was on notice of the alleged underwriting violations with respect to certain Loan Certifications as of February 2006).

38

### B.   Many of the Government's Common Law Claims Are Time-Barred

The government's common law claims—for breach of fiduciary duty (Count IV), gross negligence (Count V), negligence (Count VI), and indemnification (Count VII)—also should be dismissed to the extent that they are based on time-barred insurance claims. The statute of limitations for actions brought by the government is six years for contract claims and three years for tort claims. *See* 28 U.S.C. §§ 2415(a)-(b).[26] The limitations period for breach of fiduciary duty claims depends on whether the underlying allegations sound in contract or in tort. *See, e.g., Blusal*, 638 F. Supp. at 831-32. The three-year period for tort claims applies here because the government's theory of the case sounds in fraud, which is a tort. *See, e.g.,* Compl. ¶ 1; *Pervez*, 736 F. Supp. 2d at 810. Similarly, negligence claims are tort actions with a three-year limitations period. *See United States v. Cent. Soya, Inc.*, 697 F.2d 165, 167 (7th Cir. 1982). Thus, Counts IV, V, and VI are limited to Defendants' conduct occurring after November 15, 2007.

Finally, to the limited extent that there are contracts providing for indemnification here, *see infra*, such indemnification claims are contract actions that fall under the six-year statute of limitations. *See United States v. Skidmore, Owings & Merrill*, 505 F. Supp. 1101, 1107 (S.D.N.Y. 1981). Thus, any claims for indemnification under Count VII arising prior to November 15, 2004 are time-barred.

## V.   THE COMPLAINT FAILS TO STATE CLAIMS UNDER COMMON LAW

The common law claims tacked on to the Complaint also lack merit. First, the Complaint offers no basis on which this Court should create federal common law causes of action where Congress has provided extensive statutory and administrative remedies for addressing the alleged conduct about which the government complains. Second, even assuming they were cognizable,

---

[26] Plainly, these common law claims accrued no later than the act of Defendants giving rise to the claim, namely, the MortgageIT Loan Certification and not the later third party filing for insurance.

the common law claims suffer from several of the same fatal defects as the government's FCA claims. Third, the Complaint fails to plead the elements of the claims it purports to assert.

### A.    There Is No Basis on Which To Resort to Federal Common Law

The purported common law claims should be dismissed because they are displaced by the FCA and the HUD-FHA administrative enforcement regime. The Complaint fails to identify the source of law on which it purports to base its common law claims.[27] This silence, however, cannot change the fact that "questions involving the rights of the United States arising under nationwide federal programs," such as the DEL Program at issue here, are governed by "federal law." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726, 99 S. Ct. 1448, 1457 (1979). Thus, the government's common law claims can proceed only if such claims are cognizable under federal common law.

The default rule is that "[t]here is no federal common law." *Am. Elec. Power Co. v. Connecticut*, No. 10-174, 2011 WL 2437011, at *7 (U.S. June 20, 2011) (citation omitted). Instead, the power of federal courts to create federal common law is limited to the "few and restricted instances" where it is necessary to do so. *Milwaukee v. Illinois*, 451 U.S. 304, 313, 101 S. Ct. 1784, 1791 (1981) (citation omitted). The creation of federal common law is only "resorted to in the absence of an applicable Act of Congress" because "the Court is compelled to consider federal questions which cannot be answered from federal statutes alone." *Id.* at 313-14, 101 S. Ct. at 1791 (internal quotation omitted). In short, there is no authority for courts to create federal common law if Congress has addressed the issue.

---

[27] It is not clear whether the government means to invoke state law as the basis for its purported common law claims. If state law were to apply, it is not clear which state laws would govern. New York law might govern the signing of the Annual DEL Certifications, but if the government is alleging that the acts and omissions of MortgageIT underwriters "nationwide" give rise to liability, then presumably, the laws of up to 50 states would be implicated. The lack of specificity in the factual allegations thus makes it impossible for Defendants to predict which legal defenses are applicable.

Here, Congress has provided statutory and regulatory tools for enforcing the requirements of HUD's DEL Program. First, Congress has authorized a detailed administrative enforcement regime to ensure that DELs comply with program requirements. *See, e.g.*, 24 C.F.R. §§ 203.1, 203.3, 203.5. HUD is empowered to enforce program requirements with a variety of sanctions, probation, and termination. *See supra* at 7. In addition, the FCA and the Program Fraud Civil Remedies Act of 1986, 31 U.S.C. § 3801 *et seq.*, create penalties for "knowingly" submitting false claims to HUD. In light of this extensive statutory and regulatory framework, there is no reason for this Court to treat this case as one of the "few and restricted instances" where the remedies provided by Congress are in need of judicial supplementation. *Milwaukee*, 451 U.S. at 314, 101 S. Ct. at 1790; *see Am. Elec. Power*, 2011 WL 2437011, at *9-10 (a federal statute creating "multiple avenues for enforcement" displaced any existing federal common law claims); *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 624, 98 S. Ct. 2010, 2014 (1978).

### B.     The Purported Common Law Claims Suffer from the Same Fatal Defects as the FCA Claims

The purported common law claims also suffer from several of the same fatal defects as the government's FCA claims. First, they fail to state a claim against Deutsche Bank because they do not allege any direct acts or any theory of secondary liability. *See supra* Point II. In addition, the Complaint fails to meet the heightened pleading standard of Rule 9(b). *See supra* Point III.B. As with the FCA claims, the common law claims are based on general allegations of compliance failures and six examples of purportedly fraudulently insured mortgages in order to allege a "nationwide pattern." Compl. ¶ 136. Not only is this insufficient to state a claim under the heightened pleading standard for fraud claims under Rule 9(b), but it fails also to satisfy the plausibility standard under Rule 8(a). *See Iqbal*, 129 S. Ct. at 1949; *Twombly*, 550 U.S. at 570. Even assuming the allegations regarding the six examples are true, they provide no basis for

inferring that similar errors occurred with respect to the thousands of other loans certified by MortgageIT. *Cf. Wal-Mart Stores*, 2011 WL 2437013, at *9. Thus, any common law claims, even if they were otherwise properly pleaded against MortgageIT, would have to be dismissed as to every one of those other loans.

### C. The Complaint Fails To Plead the Elements of the Purported Common Law Claims

#### 1. The Complaint Fails To State Any Basis on Which Defendants Owed the Government a Fiduciary Duty

The Complaint baldly asserts that "[a]s fiduciaries, Deutsche Bank and MortgageIT had a duty to act for, and give advice to, the Government for the benefit of the Government as to whether mortgages should be insured by FHA under the [DE] Program." Compl. ¶ 200. Rather than identifying the source of such a duty, the Complaint goes even further afield, asserting that Defendants had a special "*uberrimae fidea*" "obligation to act in the utmost good faith, candor, honesty, integrity, fairness, undivided loyalty, and fidelity" in dealing with the government." *Id.* ¶ 201.[28] This bizarre claim fails because the Complaint identifies no basis on which MortgageIT much less Deutsche Bank owed any fiduciary duty to the government.

HUD's regulatory scheme nowhere imposes fiduciary duties on participants in the DEL Program. *See, e.g.*, 24 C.F.R. §§ 203.1, 203.3, 203.5. The Complaint does not and cannot allege otherwise. In fact, HUD is empowered to implement the DEL Program with a variety of enforcement tools, such as sanctions, probation, and even termination. *See supra* at 7. In light of such a regulatory scheme, there can be no basis for this Court to create a common law fiduciary

---

[28] The government's invocation of this inapt doctrine is puzzling. "*Uberrimae fidei* is a 'longstanding federal maritime doctrine' that 'applies to marine insurance contracts.'" *New Hampshire Ins. Co. v. C'est Moi, Inc.*, 519 F.3d 937, 938 (9th Cir. 2008) (citations omitted); *see also Commercial Union Ins. Co. v. Flagship Marine Servs.*, 190 F.3d 26, 30 (2d Cir. 1999) (referring to "the maritime doctrine of *uberrimae fidei*"). In any event, no court decision in an FCA case has adopted this doctrine.

duty.[29] *See, e.g., Curiale v. Reissman*, 798 F. Supp. 141, 146 (S.D.N.Y. 1992) (rejecting the argument that federal common law governs an institution subject to comprehensive federal regulation in the absence of statute or regulation defining fiduciary duties); *Structural Maint. & Contracting Co. v. Jayce Enters., Inc.*, No. 09-8187, 2010 WL 4159517, at *5 (S.D.N.Y. Oct. 12, 2010) (dismissing breach of fiduciary duty claim under federal common law). In short, the fiduciary duty allegations are defective as a matter of law.

> 2.  The Complaint Fails Adequately To Allege Claims Based on Gross Negligence or Negligence

The gross negligence and negligence claims fail to plead that MortgageIT, much less Deutsche Bank, proximately caused any injury suffered by the government. Based on allegations of compliance failures, the Complaint claims that "the Government has paid insurance claims, and incurred losses, relating to FHA-insured mortgages endorsed by MortgageIT." *See* Compl. ¶¶ 212, 218. But it fails to allege how any acts or omissions by MortgageIT proximately caused HUD to insure any loan, much less pay any claim for insurance.

There can be no proximate causation where the alleged actions by MortgageIT did not induce the government to insure loans that it otherwise would not have. The government concedes that HUD had knowledge of the alleged due diligence deficiencies, yet continued to insure mortgages endorsed by MortgageIT. *See* Compl. ¶¶ 10, 74-79, 127. HUD's informed decision to continue insuring these mortgages—as well as the difficult economic circumstances giving rise to defaults across the country—thus breaks the chain of proximate causation between

---

[29]  The Complaint further fails to allege control or superiority required to give rise to a fiduciary duty. *See Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*, 893 F. Supp. 285, 289 (S.D.N.Y. 1995).

any injuries suffered by the government and any alleged negligence, much less gross negligence,[30] on the part of MortgageIT. *See supra* Point III.A.4.

### 3. Indemnification Claims Not Covered by Express Indemnification Agreements Should Be Dismissed

The Complaint further fails to state a basis for its claim for indemnification. This count consists of only the most conclusory assertion that "the government is entitled to indemnification of its losses relating to FHA-insured mortgages endorsed by MortgageIT." Compl. ¶ 226. Where MortgageIT and HUD entered into express indemnification agreements, the government may have a basis on which to state such a claim (although none is adequately pleaded in the Complaint), but the Complaint fails to state a general claim for indemnification.

Under the DEL Program, the MRB has the statutory authority to seek indemnification agreements with DELs. *See* 12 U.S.C. § 1708(c)(3)(E)(v). The Complaint makes no attempt, however, to identify which mortgages at issue might be subject to any such agreements. Nor does it allege what the conditions triggering indemnification under such agreements are and whether they have been met for any particular loan. The government's indemnification claims must be dismissed unless they are based on specific loans covered by identified indemnification agreements between FHA and MortgageIT or Deutsche Bank.[31]

---

[30] The government's claims for gross negligence and punitive damages fall far short of the applicable legal standards for stating such claims. Gross negligence "is conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *Colnaghi, U.S.A., Ltd. v. Jewelers Protection Servs. Ltd.*, 611 N.E.2d 282, 283-84, 595 N.Y.S. 381, 382-83 (1993). Punitive damages require conduct that is "willful and wanton," bordering on criminal. *Home Ins. Co. v. Am. Home Prods. Corp.*, 550 N.E.2d 930, 935, 551 N.Y.S.2d 481, 486 (1990). As described above, *see supra* Point III.A, the government's conclusory allegations are not sufficiently pled to meet either standard.

[31] If the Complaint is suggesting that indemnification is proper based on some theory of implied indemnification, this too is misguided. Courts have noted that "the burden of establishing an implied agreement to indemnify is a heavy one, especially in business relationships where parties are free to negotiate for express indemnification clauses." *City of New York v. Black & Veatch*, No. 95-1299, 1997 WL 624985, at *10 (S.D.N.Y. Oct. 6, 1997). The Complaint alleges no such "special relationship" here.

### D.   Common Law Counts Based on Insurance Claims That Have Yet To Be Paid Are Not Ripe

Finally, the Complaint also appears to assert common law claims based on prospective future claims. *See* Compl. ¶¶ 205-06, 212-13, 218-19, 224-25 (alleging in common law counts that the government "will pay future insurance claims, and incur future losses").[32] Such claims are not ripe under federal common law. *See, e.g., Armored Group, LLC v. Homeland Sec. Strategies, Inc.*, No. 07-9694, 2009 WL 1110783, at *3 (S.D.N.Y. Apr. 21, 2009) ("In general, a case is not ripe if it 'involves uncertain and contingent future events that may not occur as anticipated, or indeed may not occur at all.'") (quoting *Amsat Cable, Ltd. v. Cablevision of Conn. Ltd. P'ship*, 6 F.3d 867, 872 (2d Cir. 1993)). Any claims based on future insurance payments by FHA are not ripe and should be dismissed.

## CONCLUSION

In sum, the Complaint is fatally flawed in numerous respects: It utterly fails to state any claim against Deutsche Bank; it improperly asserts FCA claims based on annual statements of compliance by MortgageIT after the Second Circuit has definitively rejected such claims; and it falls far short of properly pleading even a single loan-level claim under any theory. Accordingly, Defendants respectfully request that the Court dismiss the Complaint in its entirety with prejudice.

---

[32] The Complaint does not include any allegations about unpaid future claims in the FCA causes of action, which suggests that the government is including such claims only with respect to its common law counts. In any event, such claims would not be ripe under the FCA either. *See United States v. Inc. Vill. of Island Park*, 888 F. Supp. 419, 440 (E.D.N.Y. 1995) ("Fraudulent conduct and false statements remain inchoate until a claim for payment causing the government to disburse funds is made.").

Dated: New York, New York
      July 11, 2011

Respectfully submitted,

DECHERT LLP

By: _____

Andrew J. Levander
Cheryl A. Krause
Michael H. Park
1095 Avenue of the Americas
New York, New York  10036
Tel. (212) 698-3500
Fax. (212) 698-3599

*Attorneys for Defendants Deutsche
Bank AG and MortgageIT, Inc.*